FIRST DIVISION

APRIL 26, 2004

No. 1-03-0566

THOMAS F. SCHWINDER 
and 
)
    
Appeal from the

SUSAN L. LONDAY, 
)
    
Circuit Court of

     
)
   
 Cook County.

Plaintiffs-Appellees
,
 )

)

)

v. )        No.01-CH-1262

)

AUSTIN BANK OF CHICAGO, ) 

Trustee under Trust )

Agreement Dated February 24, 1978, )

and Known as Trust No. 5861, )    Honorable

and MARIAN BAGINSKI, ) Robert Boharic,

Defendants-Appellants.          )    Judge Presiding.

JUSTICE GORDON delivered the opinion of the court:

The instant suit arises from a chancery action filed by plaintiffs, Thomas F. Schwinder and Susan L. Londay
, seeking specific performance of a condominium purchase contract against defendants, Austin Bank of Chicago
 and Marian Baginski.  Baginski subsequently filed a counterclaim, seeking possession of the condominium unit and claiming a rental rate of $1,500 per month.  Following a bench trial, the trial court entered judgment for
 plaintiffs, granting specific performance and returning to plaintiffs a portion of rent they paid to defendant for November 2000.  
On appeal, defendants contend that the trial court abused its discretion in granting specific performance because the purchase contract granted defendants the exclusive right to terminate the purchase contract and limited plaintiffs to the exclusive remedy of the return of their earnest money.  Defendants further contend that the subsequent preclosing possession agreement
 did not modify either of those provisions.  Plaintiffs respond that defendants never had an unfettered right to terminate the purchase contract due to a mutuality of obligation that conferred on the purchase contract an implied covenant of good faith and fair dealing.  Further, plaintiffs respond that if defendants ever had such a right, the preclosing possession agreement
 modified the purchase contract and terminated that right.
  Therefore, plaintiffs argue that the 
trial court properly granted specific performance of the purchase contract.
  
In the alternative, plaintiffs claim that even if defendants had an unfettered right to terminate the purchase contract, they were estopped from doing so due to Baginski's actions and plaintiffs' detrimental reliance thereon.
  For the reasons that follow, we affirm the trial court's ruling.  

BACKGROUND

The record and testimony in this case reveal that on June 21, 2000, plaintiffs, Thomas F. Schwinder and Susan L. Londay,
 tendered an offer to purchase a condominium unit located at 3117 South Benson, in Chicago, Illinois, which was owned by defendants, Austin Bank of Chicago, trustee under trust agreement dated February 24, 1978, known as trust No. 5861 (hereinafter Trustee), and Marian Baginski.
  As the sole beneficiary of this land trust, Baginski was thus authorized to convey the title to plaintiffs.  

On July 5, 2000, Baginski accepted the offer from plaintiffs to purchase the condominium unit.  The purchase contract between the parties was a form real estate contract prepared by Baginski
's attorney and utilized for all real estate transactions in the Bridgeport Crossing Condominium complex in which the condominium unit was located.  Relevant to this case is paragraph 12 of the purchase contract, which provided as follows:

"12.  Termination and Default.

(a) If this Contract is terminated without Purchaser's fault, the earnest money shall be returned to Purchaser, but if the termination is caused by the Purchaser's fault, then at the option of the Seller and upon notice to the Purchaser, the earnest money shall be forfeited to the Seller and applied first to the payment of the Seller's expenses; the balance, if any, to be retained by the Seller as liquidated damages.  Return of the Purchaser's funds shall be the Purchaser's sole exclusive remedy in the event of Seller's default.  Purchaser acknowledges that the listing agent is hereby authorized by Purchaser to release the earnest money to seller upon written direction by the Seller that Purchaser's fault has caused a termination of the contract.

(b) A failure to appear at the time and place stated in the notice of the closing date, a failure to furnish all requested credit information, or a failure to enter into an escrow agreement or to make the deposits required thereunder shall be a default.  If the Purchaser shall fail or refuse to carry out any obligation of the Purchaser contained herein within three (3) days after receipt of written notice then, at the option of the Seller, the earnest money shall be retained by Seller as liquidated damages, and/or the Seller may elect any other available remedy.  In the event Seller shall fail to be unable to deliver title to the property as herein provided on account of title defects which Purchaser is unwilling to waive and Seller cannot cure or secure insurance over, or if Seller fails or refuses to carry out any material covenant or obligation hereunder or if Seller declines to close and notifies Purchaser, this contract shall be terminated and the earnest money and interest shall be returned to Purchaser.  The return of such earnest money shall be Purchaser's sole and only remedy in such instance, the sufficiency of which is hereby acknowledged.  Purchaser hereby waives all other remedies, other than a return of earnest money, which may be otherwise available to Purchaser."  

According to the record, attorney approval and other modifications to the purchase contract were completed on August 1, 2000.  Thereafter, closing of the sale and purchase of the condominium unit was originally scheduled for August 16, 2000.  However, by mutual agreement of the parties, the closing was rescheduled for August 31, 2000, at the offices of Stewart Title.  The purchase price for the condominium unit was $215,000
(footnote: 1), which included certain "custom
(footnote: 2)" items of construction.  

According to the testimony of Schwinder and Londay, they deposited the earnest money and obtained mortgage approval as required by the purchase contract.  They further withdrew $10,000 from their 401(k) retirement plan for use as the down payment on the purchase of the condominium unit.  Also, they testified that they were ready willing and able to close the purchase of the condominium unit on the previously agreed-upon date.  However, one day prior to the scheduled closing, plaintiffs were advised that the closing of the condominium purchase contract would be delayed due to an injunction entered in Baginski's divorce action No. 00 D 6184 (Cir. Ct. Cook County) (hereinafter Baginski divorce action).  Because the plaintiffs' lease on their pervious residence was expiring on August 31, 2000, the plaintiffs needed possession of the condominium unit pending closing.  In order to provide plaintiffs with  possession prior to closing, Baginski's attorney prepared a preclosing possession agreement (hereinafter PCPA).  The PCPA was executed by plaintiffs and Baginski on August 31, 2000.  Although the purchase contract, by its terms, prohibited possession of the condominium unit prior to closing, the PCPA granted possession of the condominium to plaintiffs until the seller, Baginski, "was able to close on the sale of the property."  The PCPA did not afford Baginski the right to terminate the contract
(footnote: 3) but, on the contrary, granted plaintiffs "the sole option [to] terminate this [PCPA] together with the Condominium Purchase Agreement *** by giving 30 days written notice to the seller" if closing had not occurred "on or prior to November 30, 2000."  

Schwinder testified that on August 31, 2000, pursuant to the PCPA, plaintiffs took possession of the condominium unit and he and his coplaintiff were to pay a monthly fee of $1,500 for the use and occupancy of the condominium unit.  Pursuant to the express terms of the PCPA, the monthly fee of $1,500 was payable only "until such time as Seller is able to close on the sale of the property."
  Plaintiffs also testified that after they took possession of the condominium unit, they purchased and installed a washer and dryer and made other such improvements therein.  

Schwinder, Londay and Baginski testified that on August 31, 2000, they executed a "Punch List of Items to be Finished at 3117 South Benson" (hereinafter punch list) pursuant to the terms of the purchase contract.
  
That day, Baginski repaired some of the punch list items.  Then in early September, Baginski repaired additional punch list items; however, there are punch list items that remain unperformed.  

On November 8, 2000, Judge Bellows entered an agreed order in the Baginski divorce action allowing the sale of the condominium unit to proceed.  Baginski's real estate attorney, Stephen Witt, was advised of the entry of the agreed order by a letter, in evidence, dated November 8, 2000, sent by plaintiffs' attorney.  That letter also requested that the plaintiffs be advised of possible closing dates so that a definitive closing date could be scheduled amongst the parties.  

Baginski testified that after receipt of the letter of November 8, 2000, from plaintiffs' attorney, he directed Witt to schedule a closing date.  Baginski further testified that he was willing to close the sale of the condominium unit if the terms of the purchase contract were met.  However, Schwinder and Loday testified that neither they nor their attorney received a response to the November 8
th
 letter.  There was no testimony or evidence introduced at trial regarding efforts made to schedule a closing for the sale of the condominium unit or an inability to do so.  Likewise, the record is devoid of any facts that would excuse or explain Baginski's refusal to consummate the sale of the condominium unit.  

Schwinder and Londay testified that on December 15, 2000, they sent a certified letter to Baginski requesting that Baginski schedule a closing date for the purchase of the condominium unit.  They obtained acknowledgment that Baginski received the letter, but never received a reply thereto.  They further testified that the next month, Baginski requested rent payments for the months November thru January.  Plaintiffs paid the rent for November, but plaintiffs refused to pay any further rent, claiming that they did not want to be renters; Baginski responded that the matter was in the lawyers' hands.  

Plaintiffs testified that they made one final attempt on January 16, 2001, to procure a closing date by sending Baginski's attorney a letter to that effect.  A response from Baginski's attorney, in evidence, provided that he was no longer representing Baginski, and no closing date was scheduled in response to the January 16
th
 letter.  

On January 24, 2001, plaintiffs filed a complaint for specific performance against defendants.
  Defendants filed a counterclaim seeking possession of the condominium unit and claiming unpaid rent after November 2000.

On October 18, 2002, the trial court entered its judgment.  The trial court found that the purchase contract and the PCPA were binding upon the parties.  Despite the existence of paragraph 12 previously discussed, the trial court required specific performance on the part of Baginski in proceeding with the purchase contact.  Further, the trial court denied Baginski's counterclaim and found that Baginski was not owed rent after November 8, 2000, the date on which the agreed order in the divorce action granted Baginski the right to close on the condominium unit.  

On November 18, 2002, defendants filed a motion for reconsideration.  That motion requested a rehearing based on newly discovered evidence not available at the time of the trial and upon errors made by the trial court in application of the law.  Specifically, defendants alleged that there were liens on the property that would have made it impossible for them to convey good title to the property.  These liens, defendants alleged, were discovered after the close of trial.  On January 27, 2003, the trial court denied defendant's motion for reconsideration.

On February 7, 2003, defendants filed a petition for leave to appeal the decision of the trial court granting specific performance.  This court granted the petition for leave to appeal pursuant to Supreme Court Rule 301.  

On appeal, defendants contend that the trial court abused its discretion in granting specific performance of the purchase contact
.  We affirm.

ANALYSIS

PCPA Modified the Purchase Contract

The controlling issue in this case is whether the plaintiffs had a right to seek specific performance when the purchase contract limited their remedy to the return of their earnest money.  Defendants argue that, pursuant to the purchase contract, they had an unfettered right to terminate the sale of the condominium unit without suffering any loss other than the return of plaintiffs' earnest money.  Moreover, defendants argue that the PCPA did not modify these rights.  Plaintiffs respond that their remedy was not restricted by the purchase contract and that the grant of specific performance was proper.  Plaintiffs' response is predicated on their claim that defendants did not have an unfettered right to terminate the purchase contract and return the earnest money because the PCPA modified the purchase contract, thereby divesting defendants of that right.  In the alternative, plaintiffs respond that even if defendants had an unfettered right to terminate the purchase contract and return plaintiffs' earnest money, they were estopped from doing so due to Baginski's actions and plaintiffs' detrimental reliance thereon.  The trial court agreed with plaintiffs in finding that they were not limited to the return of their earnest money.  In that regard, the trial court held that the execution of the PCPA modified the purchase contract and thereby superceded any right defendants had to terminate the purchase contract and only suffer the return of plaintiffs' earnest money, which would return defendants to their original position.  Moreover, the trial court found that the purchase contract was valid and enforceable and that the equities in this case warranted specific performance of that contract.  We agree with the plaintiffs' position and the finding of the trial court.  

First, we must consider whether the PCPA modified the purchase contract so as to divest defendants of their right to terminate the purchase contract and return plaintiffs' earnest money.  In doing so, we must look to the definition and elements of a modification.  
A "modification" of a contract is a change in one or more respects which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect undisturbed.
 
 
Hartwig Transit, Inc.v. Menolascino
, 113 Ill. App. 3d 165, 170, 
446 N.E.2d 1193, 1195 
(1983); 
International Business Lists, Inc., v. American Telephone & Telegraph Co.
, 
147 F.3d 636, 640 (7
th
 Cir. 1998) (applying Illinois law).  Modification of a contract normally occurs when the parties agree to alter a contractual provision or to include additional obligations, while leaving intact the overall nature and obligations of the original agreement.  See 
Hartwig
, 113 Ill. App. 3d at 170, 
446 N.E.2d at 1195
.
  

Parties to a contract are not locked into its terms forever.  
Accordingly, parties to an existing contract may, by mutual assent, modify the purchase contract provided that the modification does not violate law or public policy
.  
17A Am. Jur. 2d Contracts §
500 (1991).  It is entirely competent for parties to a contract to modify or waive their rights under it and embed new terms upon it.  See 
Canale v. Hulcher
, 
85 Ill. App. 2d 9, 
227 N.E.2d 795 (1967) (abstract of opinion).  Furthermore, parties to a contract are ordinarily as free to change it after making it as they were to make it in the first instance.  Restatement of Contracts §408 (1932).

Under Illinois law, a valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration.
  
Scutt v. LaSalle County Board
, 97 Ill. App. 3d 181, 185, 
423 N.E.2d 213, 216
 (1981); 
Gorman Publishing Co. v. Stillman
, 516 F. Supp. 98, 108 (N.D. Ill. 1980) (modification of a contract is itself a contract and only enforceable where ordinary standards of contract law are satisfied).  Hence, 
no contract can be modified in 
ex parte
 fashion by one of the contracting parties without the knowledge and consent of the remaining party to the agreement, 
Brooks v. Village of Wilmette
, 72 Ill. App. 3d 753,  756,
 391 N.E.2d 133, 136
 (1979);
 
Hulcher v. Adcock
, 25 Ill. App. 2d 255, 
166 N.E.2d 168 
(1960) (abstract of opinion),
 thereby making mutual assent as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract. 
 
Keco Industries, Inc. v. ACF Industries, Inc.
, 316 F.2d 513, 515 (4
th
 Cir. 1963); 
Hulcher
, 
25 Ill. App. 2d at 255; 
166 N.E.2d at 168
.

A modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract. 
 
Carabetta Enterprises, Inc. v. United States
, 58 Fed. Cl. 563, 567 (2003); 
Restatement of Contracts §408 (1932).
  The modified contract is regarded as creating a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed.
  
Downers Grove Associates v. Red Robin International, Inc
., 151 Ill. App. 3d 310, 318, 
502 N.E.2d 1053, 1059
 (1986).  Furthermore, when a contract is modified or amended by a subsequent agreement, any lawsuit to enforce the argument must be brought on the modified agreement and not on the original agreement.  
Hulcher
, 25 Ill. App. 2d at 255, 
166 N.E.2d at 168
.  The interpretation of any contract is a question of law to be determined by the appellate court independently of the trial court's judgment and in accordance with general rules applicable to contract construction.  
Hartwig
, 113 Ill App.3d at 168, 
446 N.E.2d at 1195
.  

In this case, the PCPA was a latter written agreement regarding the same subject as the original contract, the sale of the condominium unit.  Paragraphs 3 and 4 of the PCPA specifically provides as follows: 

3. "***Purchaser and seller do hereby agree to extend the closing date for the sale of the property as set forth in the contract until such date as seller receives a Court Order relieving seller from the a temporary restraining order barring the transfer of the property or is otherwise able to close on the sale of the property."

4. "***If seller is unable to close on the sale of the property on or before November 30, 2000, then the purchaser at purchasers sole option may terminate this agreement together with the condominium purchase agreement jointly entered into by and between purchaser and seller."

It is clear that the purpose of the PCPA was to serve as an adjunct to the purchase contract, 
altering contractual provisions and including additional obligations, while leaving intact the overall nature and obligations of the original agreement.  
Hartwig
, 113 Ill. App. 3d at 168, 
446 N.E.2d at 1195
.  The record here reveals that following the execution of the purchase contract the parties encountered an obstacle not provided for in the original sales contract.  Specifically, Baginski was unable to close the sale of the condominium unit due to an injunction imposed by the Baginski divorce.  In an effort to facilitate the execution of the contract, defendants allowed plaintiffs to take possession of the condominium unit and promised that the closing date would be scheduled as soon as the agreed order from the Baginski divorce was obtained.  The parties then executed the PCPA to reflect this agreement.  The PCPA allowed plaintiffs possession of the condominium unit when the purchase contract had strictly forbid it.  Furthermore, the PCPA rescheduled the closing date and gave plaintiffs the right to terminate the purchase contract if the closing was not scheduled by November 2000.

According to Illinois law, the PCPA was a valid modification to the purchase agreement, because it 
satisfied all the criteria essential for a valid original contract, including offer, acceptance, consideration and mutual assent.
  
Scutt
, 97 Ill. App. 3d at 185, 423 N.E.2d at 216
; 
Gorman Publishing
, 516 F. Supp. at 108.
  
As enumerated above, the offer was the presentment of the PCPA by defendants to plaintiffs.  Plaintiffs then accepted defendants' offer, as it was presented, with no changes or counteroffers.  The PCPA enumerated the consideration of possession of the condominium unit for a monthly payment.  This consideration consisted of two new promises, insomuch as they were not encompassed by the original purchase contract.  Finally, modification of the purchase contract was reached because there was mutual assent by both plaintiffs and defendants as to the terms of the PCPA, exemplified by both signatures on the bottom of the PCPA.  See 
John Kubinski & Sons, Inc. v. Dockside Development Corp.
, 33 Ill. App. 3d 1015, 1022, 
339 N.E.2d 529, 532 
(1975) (finding that there was no mutual assent to the terms and no agreement for modification where both parties did not sign in the space provided).  

Finding that the PCPA was a valid modification of the purchase contract, to the extent that the PCPA contained inconsistent terms with the purchase contract, the PCPA should control.  
Downers Grove Associates
, 151 Ill. App. 3d at 318, 
502 N.E.2d at 1060
.  The inconsistencies, as indicated above, divested defendants of the any right to terminate the purchase agreement.  Furthermore, the PCPA, by its terms, no longer limited plaintiffs to the remedy of return of their earnest money, thereby implicitly opening the door to remedies allowed by law and equity.
(footnote: 4)  

Therefore, it is clear that the execution of the PCPA manifested the parties' intentions, as concluded by the trial court, to modify the purchase contract by amending its terms to provide a solution to a problem not anticipated under the terms of the purchase contract; a solution that intended not only to progress the sale of the condominium unit, but also modify the purchase contract, thereby relieving defendants of existing rights and granting plaintiffs additional rights.  That solution implied that the additional rights were inserted to entice plaintiffs not to forsake the contract despite the unanticipated delay.  Consequently, those modifications and the language used in the PCPA are inconsistent with the retention of any right defendants had to terminate the purchase contract and only suffer the return of plaintiffs' earnest money.

Therefore, we agree with the trial court's determination that the PCPA modified the purchase contract and thereby superceded any right defendants had to terminate the purchase contract and only suffer the return of plaintiffs' earnest money.  

Estoppel

Despite this determination, we consider plaintiffs' alternative estoppel argument, finding that even if the purchase contract had allowed defendants an unfettered right to terminate and held plaintiffs to the exclusive remedy of the return of their earnest money, defendants were estopped from asserting such rights.  In that regard, plaintiffs contend that estoppel was based on Baginski's actions and plaintiffs' detrimental reliance thereon.  Defendants respond that plaintiffs never testified that they relied on Baginski's actions or changed their position in reliance on anything he did.  The trial court found that the evidence proved that Baginski's actions induced reliance and plaintiffs reasonably relied on those actions.  We agree with plaintiffs' and the trial court's position.  

An estoppel is an impediment or bar to the assertion of a right arising as a result of one's own actions.  
Byron Community Unit School No. 226 v. Dunham-Bush, Inc.
, 215 Ill. App. 3d 343, 348, 
574 N.E.2d 1383, 1387
 (1991); 
Greer v. Carter Oil Co.
, 373 Ill. 168, 176-77, 
25 N.E.2d 805, 809-10
 (1940).  The doctrine of estoppel is invoked to prevent fraud and injustice.  
Hickey v. Illinois Central R.R. Co.
, 35 Ill. 2d 427, 449, 
220 N.E.2d 415, 421
 (1966).  The test is whether under all the circumstances of the particular case, conscience and honest dealing require that the defendant be estopped.  
Byron
, 215 Ill. App. 3d at 348, 
574 N.E.2d at1387
 citing 
Carey v. City of Rockford
, 134 Ill. App. 3d 217, 218, 
480 N.E.2d 164, 165
 (1985).  Estoppel arises when a party, by his words or conduct, intentionally or through culpable negligence, induces reasonable reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position to his injury.  
Byron
, 215 Ill. App. 3d at 348, 
574 N.E.2d at1387
; 
Payne v. Mill Race Inn
, 152 Ill. App. 3d 269, 277, 
504 N.E.2d 193, 199
 (1987); 
Gary-Wheaton Bank v. Meyer
, 130 Ill. App. 3d 87, 95-96, 
473 N.E.2d 548, 554
 (1984).  While an intent to mislead is not necessary, the reliance by the other party must be reasonable.  
Byron
, 215 Ill. App. 3d at 348, 
574 N.E.2d at1387
.  

Even assuming arguendo that Baginski had an unfettered right to unilaterally terminate the purchase contract and limit plaintiffs' damages to the return of the earnest money pursuant to paragraph 12 of the purchase contract, by his actions and conduct Baginski was estopped from asserting any such right.  It is clear and undisputed that Baginski freely entered into the PCPA, allowing plaintiffs to take possession of the condominium unit prior to closing and planning the closing date to take place immediately after the injunction from Baginski's divorce action was lifted.  Baginski executed a punch list of items that plaintiffs wanted repaired in the condominium unit prior to closing, and Baginski repaired some of the items on the punch list.  Baginski freely undertook and obtained an agreed order removing the injunction in the Baginski divorce as an impediment to closing.  Further, Baginski did not try to terminate the purchase contract until after he was aware of plaintiffs' suit for specific performance.  In fact, Baginski never returned or tendered the return of plaintiffs' earnest money.  Notably, Baginski did not offer a reason for his failure and refusal to close on the property until his motion to reconsider.  That motion to reconsider announced that the property was subject to a lien and therefore Baginski could not transfer good title to the plaintiffs.  The trial court denied that motion, finding that the land was free of encumbrances.  By these actions, Baginski clearly misled plaintiffs and induced their reliance.  

Plaintiffs, as a result of that reliance, moved into and took up residence in the condominium unit, where they have remained for the past two years.  They also made repairs and improvements to the condominium unit.  One such improvement, was the purchase and installation of a washer and dryer in the condominium unit.  Further, plaintiffs withdrew money from their 401(k) for the down payment and suffered penalties for doing so.  If estoppel is not invoked in this case, plaintiffs would be the victims of a formidable injustice.  

Based upon the forgoing, the trial court was correct in holding that even if Baginski had an unfettered right to terminate the purchase contract and limit plaintiffs' damages, he would be estopped from asserting that right.   

Specific Performance

We must now consider the substantive merit of
 defendants' argument that the grant of specific performance was not proper even if the remedy under the purchase contract was not exclusive.  Initially, it must be noted that specific performance may only be granted where there is a valid and enforceable contract.  
Omni Partners v. Down
, 246 Ill. App. 3d 57, 62, 
614 N.E.2d 1342, 1345
 (1993); 
Perkins v. Garcia
, 194 Ill. App. 3d 590, 593, 
551 N.E.2d 258, 260
 (1990).  Although neither party contends that the purchase contract is invalid, the defendants do contend that they have an unfettered right to terminate the purchase contract.  This contention lends itself to the argument that the contract lacks mutuality of obligation and is thereby invalid.  
In its most elemental sense, the doctrine of mutuality of obligation means that unless both parties to a contract are bound by its terms, neither is bound.  See 
Kraftco Corp. v. Kolbus
, 1 Ill. App. 3d 635, 638, 
274 N.E.2d 153, 155
 (1971).  
"Mutuality of obligation in bilateral contracts is but another way of stating that consideration is essential".  25 R. Lord, Williston on Contracts 
§
67:42, at 332 (4th ed. 2002).  The absence of mutuality of obligation could render the contract invalid and unenforceable.  Such a mutuality of obligation issue arises when there is one party to a contract that has an unfettered right to terminate the contract.  
Borys v. Josada Builders, Inc.
,  110 Ill. App. 3d 29, 32-33, 
441 N.E.2d 1263, 1265-66
 (1982)
;
 
A.W. Fiur Co. v. Ataka & Co.
, 71 A.D.2d 370, 372-73, 422 N.Y.S.2d 419, 421 (1979)
.

To counter that result, courts have found an implied covenant of good faith and fair dealing
.  
Every contract contains this implied promise of good faith and fair dealing between the contracting parties.  Restatement (Second) of Contracts §205 (1981).
  These promises limit the  manner in which the party who is vested with discretion under the contract may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.  
Abbott v. Amoco Oil Co.
, 
249 Ill. App. 3d 774, 782, 
619 N.E.2d 789, 795
 (1993)
.
  "
The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context."  Restatement (Second) of Contracts §205, comment a
, at 100 (1981)
.
  "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness."  Restatement (Second) of Contracts §205, comment a, at 100 (1981)
; 
Borys
, 110 Ill. App. 3d at 32-3
, 441 N.E.2d at 1265-66
.
  
The appropriate remedy for "bad faith" or a breach of the duty of good faith varies with the circumstances.  
Restatement (Second) of Contracts §205, comment a
, at 100 (1981)
.

Furthermore, a contract should be construed as a whole to give effect to the intention of the parties.  
DeWitt County Public Building Comm'n v. County of DeWitt
, 128 Ill. App. 3d 11, 18, 
469 N.E.2d 689, 695
 (1984).  Great weight is to be given to the principal, apparent purpose and intention of the parties at the time that they entered into the contract.  
Ancraft Products Co. v. Universal Oil Products Co.
, 100 Ill. App. 3d 694, 697, 
427 N.E.2d 585, 587
 (1981); 
DeWitt
, 128 Ill. App. 3d at 18, 
469 N.E.2d at 695
. 
 
It follows that a contract should be construed so as to make the obligations imposed by its terms mutually binding upon the parties, unless such a construction is wholly negated by the language used
.  
DeWitt
, 128 Ill. App. 3d at 18, 
469 N.E.2d at 695
 (finding that 
contractual terms should be construed to avoid the conclusion that other terms are redundant and meaningless)
.

On the basis of the above-cited cases, we must interpret the disputed provisions of the present
 purchase contract, specifically paragraph 12, in such a manner as not to render meaningless the parties' obligations to one another.  See 
Borys
, 110 Ill. App. 3d at 32-33, 
441 N.E.2d at 1265-66
;
 see also 
DeWitt
, 128 Ill. App. 3d at 18, 
469 N.E.2d at 695
.  Paragraph 12, enumerated above, explicitly provided that "[i]f this Contract is terminated without Purchaser's fault, the earnest money shall be returned to Purchaser."  In view of the covenants of good faith and fair dealing, the clause "if this contract is terminated without Purchasers fault," should be construed as meaning that the seller, Baginski, should make every effort to insure that the purchase contract is not terminated, but that if termination is due to circumstances beyond his control, plaintiffs could get their money back.  
See 
Borys
, 110 Ill. App. 3d at 32-33, 
441 N.E.2d at 1265-66
;
 see also 
DeWitt
, 128 Ill. App. 3d at 18, 
469 N.E.2d at 695
.  Conversely, if we construed paragraph 12 to mean that the seller could, at will, terminate the purchase contract and return buyers' earnest money, this would impute bad faith, because the seller by returning the earnest money would be returned to his original position.  Therefore, the seller would suffer no loss and the buyers could do nothing to secure their position.

The above interpretation of paragraph 12, which incorporates a duty of good faith and fair dealing, is supported by a 
large number of cases which hold that contractual language, that on its face, gives one or the other of the parties an unbridled right to cancel or terminate the contract must, if possible, be construed so as to sustain the validity of the contract in question.  
A.W. Fiur Co.
, 71 A.D. 2d at 372-73, 422 N.Y.S.2d at 412 (
finding that a distribution agreement between a fabric manufacturer and fabric distributor that gave the manufacturer " 'the absolute and exclusive right to reject any orders for any reason whatsoever,' " did not support a right on the part of the manufacturer to arbitrarily refuse to accept orders, since every contract contains an implied condition requiring the parties to deal with each other in good faith); 
Bernstein v. W.B. Manufacturing Co.
, 235 Mass. 425, 427, 
126 N.E. 796, 797
 (1920) (holding that a statement on a sales order that 
" '[we (the sellers) ] will under no circumstances hold ourselves liable for failure to deliver any portion of orders taken, sometimes caused by circumstances over which we have no control,' " is not fatal to the validity of the sales contract, since such language may be interpreted as meaning that the sellers are bound to deliver unless circumstances beyond their control prevent them from doing so).

Similarly, the courts have imputed good faith and fair dealing in real estate purchase agreements.  
See 
Borys
, 110 Ill. App. 3d at 32-33, 
441 N.E.2d at 1265-66
.
  
In 
Borys
, a contract for the purchase of a condominium provided that failure or inability on the part of the seller to deliver title as a result of defects therein, which the buyer was unwilling to accept, would terminate the contract with the seller's liability limited to return of the buyer's deposit.  
Borys
, 110 Ill. App. 3d at 32-33, 
441 N.E.2d at 1265-66
.
  The buyer contended that the seller's ability to control the quality of the title and its limited liability for breach of the agreement rendered the contract void for want of mutuality.  
Borys
, 110 Ill. App. 3d at 32-33, 
441 N.E.2d at 1265-66
.
  The court held, however, that contractual clauses imposing an obligation on the seller to cause the unit to be sold and conveyed to the buyer, when read in view of the entire contract and construed in
 accordance with the implied contractual term requiring the parties to act in good faith, supported the conclusion that the sellers did not have the right to arbitrarily decide not to sell by providing an inadequate title and returning the buyers' earnest money.  
Borys
, 110 Ill. App. 3d at 32-34, 
441 N.E.2d at 1265-66
.
  
Applying 
Borys
 to the instant case would impose a duty of good faith and fair dealing on the provision granting the right to terminate the purchase contract and on the limitation of remedies available to plaintiffs, thereby 
imposing mutually binding obligations on both plaintiffs and defendants and rendering the purchase contract valid and enforceable.
(footnote: 5)  

Finding the purchase contract valid and enforceable, we must now consider whether the grant of specific performance was proper in this case.  The principle underlying the specific performance remedy is to grant equitable relief where the damage remedy at law is inadequate.  See 
Geist v. Lehmann
, 19 Ill. App. 3d 557, 561, 
312 N.E.2d 42, 46
 (1974).  At the time this branch of equity jurisdiction was evolving in England, the presumed uniqueness of land, as well as its importance to the social order, led to the conclusion that damages at law could never be adequate to compensate for the breach of a contract to transfer an interest in land.  Hence, specific performance became a fixed remedy in this class of transactions.  See 11 S. Williston on Contracts 
§
1418A (3d ed. 1968); 5A A. Corbin on Contracts 
§
1143 (1964).  

"Two distinct elements enter into the application of [specific performance]: first, the extent to which the evidentiary function of the statutory formalities is fulfilled by the conduct of the parties; second, the reliance of the promisee, providing a compelling substantive basis for relief in addition to the expectations created by the promise."  Restatement (Second) Contacts 
§
129, comment b, at 322 (1981).  The evidentiary element can be satisfied by a meticulous examination of the evidence and realistic appraisal of the probabilities on the part of the trier of fact; commonly summarized in a standard that calls upon the trier of fact to be satisfied by "clear and convincing evidence."  Restatement (Second) Contacts 
§
129, comment b, at 322 (1981).  The substantive element requires consideration of the adequacy of the remedy of restitution.  Restatement (Second) Contacts 
§
 129, comment b, at 322 (1981).  

Illinois courts have long held that where the parties have fairly and understandingly entered into a valid contract for the sale of real property, specific performance of the contract is a matter of right and equity will enforce it, absent circumstances of oppression and fraud.  
Gianni v, First National Bank of Des Plaines
, 136 Ill. App. 3d 971, 981, 
483 N.E.2d 924, 933
 (1985).  
Contracts to devise or convey real estate are enforced by specific performance on the ground that the law cannot "do perfect justice."  
Gianni
, 136 Ill. App. 3d at 981, 483 N.E.2d at 933
; 
Hagen v. Anderson
, 317 Ill. 173, 177, 
147 N.E. 791, 793
 (1925)
.
  Generally, a party will be entitled to specific performance of a contract for conveyances of real estate only upon establishing either that the party has performed according to the terms of the contract or that the party was ready, willing and able to perform but was prevented, and thus excused from doing so by the acts or conduct of the other party.  
Omni Partners
, 246 Ill. App. 3d at 63, 
614 N.E.2d at 1346
; 
Tantillo v. Janus
, 87 Ill. App. 3d 231, 234, 
408 N.E.2d 1000, 1003 
(1980).

Specific performance is a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of a particular case.  
Omni Partners
, 246 Ill. App. 3d at 62, 
614 N.E.2d at 1345
; 
Djomlija v. Urban
, 107 Ill. App. 3d 960, 967, 438 N.E. 2d 558, 563 (1982).  In this regard, the trial court should balance the equities between the parties.  
Hild v. Avland Development Co.
, 46 Ill. App. 3d 173, 179, 
360 N.E.2d 785, 790
 (1977).  Accordingly, a court using its equitable powers may refuse to grant specific performance where the remedy would cause a peculiar hardship or inequitable result.  
Geist
, 19 Ill. App. 3d at 561, 
312 N.E.2d at 46
.  A court's decision to grant such relief will not be disturbed absent an abuse of discretion.  
Omni Partners
, 246 Ill. App. 3d at 62, 
614 N.E.2d at 1345
; 
Tantillo
, 87 Ill. App. 3d at 239, 
408 N.E.2d at 1003
.  

In applying the requirements needed for specific performance, first, we must set forth that both plaintiffs and defendants freely and understandingly entered into a purchase contract for the sale of the condominium unit.  There is no question from the facts in this case that there was no fraud or oppression by either party upon the other at the time of execution of the purchase contract.  In fact, defendants note multiple times in their brief that both parties fully understood the purchase contract before they executed it.  

Next we must turn to whether a condominium is the proper subject of specific performance.  Although neither of the parties contends that specific performance cannot be granted when dealing with a  condominium unit, the question of uniqueness is an issue of concern for courts.  On one side is the argument that condominium units are real estate, 
per se
 unique and thus entitled to a remedy in equity.  See 
Gianni
, 136 Ill. App. 3d at 981, 
408 N.E.2d at 1003
.  On the other side is the argument that a condominium unit is but one of thousands with the same layout, typically in the same building, and therefore are only entitled to remedies at law.  See 
Centex Homes Corp. v. Boag
, 128 N.J. Super. 385, 389, 
320 A.2d 194, 196
 (1974)
.  However, using either argument, there is no question that the condominium unit in this case is unique.  
Gianni
, 136 Ill. App. 3d at 980-81,
 
408 N.E.2d at 1003
 (although there has been debate over whether condominium units are unique and thus are the proper subject of specific performance, this court held that condominiums are "real property" for the purposes of specific performance
); but see 
Centex Homes
, 128 N.J. Super. at 389, 
320 A.2d at 196
 (finding that 
except upon a showing of unusual circumstances or a change in the vendor's position, such as where the vendee has entered into possession, the vendor's damages are usually measurable, his remedy at law is adequate and there is no jurisdictional basis for equitable relief).
  The condominium unit in this case is
 obviously unique under the 
Gianni
 argument, and it meets the exact exception making it unique under the 
Centex Homes
 argument.  
Gianni
, 136 Ill. App. 3d at 980-82, 408 N.E.2d at 1003
; 
Centex Homes
, 128 N.J. Super. at 389,  
320 A.2d at 196
.
  The condominium unit was not sold as a sample; it was 
substantially upgraded to plaintiffs' specifications.  Furthermore, plaintiffs themselves have made improvements to the condominium unit.  Lastly, and most importantly, the condominium unit in this case has been plaintiffs' home for the past two years.  The uniqueness of this condominium unit to the plaintiffs makes it an unquestionably proper subject for specific performance and makes the remedy at law inadequate.  

Finding that a remedy at law was inadequate, the trial court found, and we agree, that it would be inequitable to deny specific performance in this case.  The above-enumerated facts bear this out.  Notably, plaintiffs paid the earnest money to defendants, took possession of the condominium unit, withdrew their 401(k) for a down payment, obtained mortgage commitment papers and made substantial improvements to the condominium unit.  It would be inequitable for the court to allow plaintiffs to bear all the loss they suffered and move them out of their home when they complied with all of the terms of the agreement.  

Furthermore, at all times during the 
pendency of the sales contract, plaintiffs were ready, willing and able to perform but were prevented, and thus excused, from doing so by Baginski's refusal to schedule a closing date.  Plaintiffs were ready with a mortgage approval and a down payment in hand to close on the condominium unit the very instant Baginski assigned a closing date.  However, Baginski repeatedly refused to schedule the closing date, and thus, plaintiffs never consummated the sale of the condominium unit.  

Based on the foregoing, the trial court's determination to grant specific performance of the purchase contract was proper in this case.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed. 

O'MALLEY, P.J., and McBRIDE, J., concur.  

FOOTNOTES
1:
Baginski testified that the purchase price for the condominium unit was never agreed upon, however, the trial court found that Baginski's testimony was not credible.  We agree with the trial court that the contract price was $215,000 based on the contract itself, Baginski's verified answer to the complaint, an executed direction to convey trustee's deed to Schwinder and Londay and the agreed order of November 8, 2000.

2:
"Custom" items refers to plaintiffs' choices of particular finishes they wanted the condominium unit to contain.  These choices affected the contract price.  

3:
Baginski never attempted to terminate the purchase contract prior to plaintiffs filing a suit for specific performance. 

4:
According to the law of contracts, even if the PCPA had not modified the damages set forth in the purchase contract, the mere presence of a damages provision in the purchase contract would not have prevented plaintiffs from seeking specific performance.  
Rootberg v. Richard J. Brown Associates
, 14 Ill. 3d 301, 302-03 (1973) (the
 fact that a contract provides for liquidated damages in case of failure to perform does not itself prevent a court from decreeing specific performance); 
Moritz v. Broadfoot
, 35 Wis. 2d 343, 347 (1967) (presence of liquidated damages clause does not prevent injured party from seeking equitable relief as a complete alternative to damages).

5:
Plaintiffs also contend that they are entitled to specific performance of the purchase contract because defendants, specifically Baginski, breached the implied covenant of good faith and fair dealing.
  While there may have been evidence of bad faith which would preclude Baginski from enforcing the exclusivity of remedy provided in the purchase contract and justify the imposition of specific performance, we find no need to make a determination that would substantiate that contention since we have ample reason to uphold the trial court's determination for the reasons already discussed.