2024 IL App (1st) 221704-U

No. 1-22-1704

Third Division
February 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

|  |  |  |
|---|---|---|
| TOPCO ASSOCIATES, LLC, | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellant and Cross-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 2020 L 011195 |
| | ) | |
| CASCADES HOLDINGS US INC., d/b/a Cascades Tissue Group, | ) | The Honorable |
| | ) | Patrick J. Sherlock, |
| | ) | Judge Presiding. |
| Defendant-Appellee and Cross-Appellant. | ) | |
| | ) | |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Van Tine concurred in the judgment.

**ORDER**

¶ 1     *Held:*  We reverse the trial court's grant of summary judgment and the resultant entry of judgment in favor of the defendant and against the plaintiff on the complaint, as a modification of the parties' contract operated to rescind a prior provision permitting termination of the contract upon 90 days' written notice. The matter is remanded for a new trial on the plaintiff's complaint and the defendant's counterclaim.

¶ 2     In 2004, plaintiff Topco Associates, LLC (Topco), and defendant Cascades Holdings US Inc., d/b/a Cascades Tissue Group (Cascades), entered into a contract for the purchase and sale of certain paper products sold by Cascades. In 2018, the parties modified that contract to

include, *inter alia*, a clause providing for the expiration of the contract in September 2021. In June 2020, however, Cascades terminated the contract, relying on a 90-day termination clause contained in the original version of the contract. Topco filed a lawsuit, alleging that Cascades had breached the contract by terminating it prior to its expiration date and contending that the 90-day termination clause did not survive the 2018 modification. In turn, Cascades filed a counterclaim, alleging that Topco had failed to pay for certain shipments received during the 90-day termination period.

¶ 3 The trial court granted summary judgment in favor of Cascades on Topco's complaint, finding that Cascades was entitled to terminate the contract with 90 days' notice, and the matter proceeded to trial solely on the counterclaim. After a bench trial, the trial court entered judgment in favor of Cascades on the counterclaim, finding that Topco had breached the contract by failing to pay for goods it had received. Cascades filed a petition for attorney fees, as permitted by the contract, and the trial court granted its petition, although it reduced the fees by approximately one third. Both parties now appeal.

¶ 4 In its appeal, Topco contends (1) the trial court erred in granting summary judgment in favor of Cascades with respect to the complaint, (2) the trial court erred in permitting undisclosed witnesses to testify at trial, and (3) the attorney fees awarded to Cascades should have been further reduced. In its cross-appeal, Cascades claims that the trial court erred in reducing its fee award. For the reasons set forth below, we reverse the judgment of the trial court and remand for a new trial on both the complaint and the counterclaim.

¶ 5                                                    BACKGROUND

¶ 6                                                     *Contracts*

¶ 7         Topco is owned by a number of regional grocery stores and other food industry members and, on behalf of its members, Topco negotiates with suppliers, enters into supply agreements, and purchases products for resale to its members and other customers. In 2004, Topco entered into one such agreement with Cascades, a company which manufactures and converts paper products for residential and commercial use (the 2004 agreement).

¶ 8         The 2004 agreement provided that Cascades agreed to sell certain products to Topco or its members. As relevant to the instant appeal, paragraph 1.2 of the 2004 agreement governed the term of the agreement and provided: "This Agreement shall commence on the date set forth above and shall continue until terminated by either party upon 90 days advance written notice." Other than the "90 days advance written notice" requirement in paragraph 1.2, the 2004 agreement did not include any language restricting the ability to terminate. Additionally, paragraph 1.6(b) of the 2004 agreement provided that Cascades was entitled to defer shipments while any of Topco's invoices remained past due and "Topco shall pay all reasonable costs and expenses, including reasonable attorney's fees incurred by [Cascades] for the collection of any sum payable by Topco to [Cascades]."

¶ 9         In April 2018, Topco and Cascades executed a modification of the 2004 agreement (the 2018 agreement). The 2018 agreement did not expressly reference any of the terms of the 2004 agreement, but indicated that it "outline[d] the terms and conditions of the Topco and Cascades mutually beneficial partnership agreement." It contained four sections: "Topco commits to the following," "Cascades commits to the following," "Protection—Cost, Quality and Fill Rate," and "Cost Component Measurements Options." The section concerning Topco's commitments

indicated that Cascades would be Topco's primary supplier of conventional tissue products for several Topco labels "through the terms of this Agreement which runs through shipments of September 30, 2021." In turn, Cascades committed to several price reductions and freight savings in 2018 and 2019. The parties also agreed to review key commodity cost components in September 2020. Finally, the 2018 agreement provided: "*The length of the partnership, shipments through September 30, 2021,* is a critical component for Cascades. The length of this partnership allows Cascades to strategically invest in new high-speed equipment to support our mutually aggressive growth plans." (Emphasis in original.)

¶ 10                              *Complaint and Counterclaim*

¶ 11          In June 2020, Cascades sent a letter to Topco terminating its contract pursuant to the 90-day termination provision contained in paragraph 1.2 of the 2004 agreement and providing that it would discontinue its shipments on September 25, 2020. In response, Topco sent a letter to Cascades "reject[ing] [the] purported termination of the agreement between the parties." Topco contended that the 2004 agreement had "long been superseded" by newer agreements, including the 2018 agreement, which set forth a fixed multiyear term for the contract which could not be terminated by either party prior to that date. Cascades responded that its position was that the 2018 agreement was a complementary agreement to the 2004 agreement, and that the 2004 agreement remained in full force and effect.

¶ 12          Accordingly, in October 2020, Topco filed a complaint against Cascades for breach of contract and promissory estoppel, alleging that Cascades had breached the 2004 agreement, as modified by the 2018 agreement, by seeking to terminate the contract prior to its September 2021 expiration date.

4

¶ 13    Cascades filed an answer and affirmative defenses, as well as counterclaims for account stated, unjust enrichment, and breach of contract, alleging that Topco had failed to pay for all of the paper products it purchased from Cascades.

¶ 14    As part of the discovery process, the trial court ordered that the parties were to answer Rule 213(f)(3) interrogatories by October 15, 2021 (see Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018)), and that "[a]ll Discovery [was] to be completed by 11-30-2021."

¶ 15    Cascades' June 22, 2021, response to Topco's first set of interrogatories indicated that the responses were prepared by its counsel based on information provided by Stephen Fraser, the vice president of sales for its retail division, among others. The response further identified Fraser as having knowledge of the 2004 and 2018 agreements and documents relating to their negotiations, as well as the termination of the parties' contract. The response indicated that Cascades intended to present damages testimony through an expert, "but has not yet identified any such expert at this early stage of the lawsuit."

¶ 16    *Motions for Summary Judgment*

¶ 17    On October 5, 2021, Topco filed a motion for partial summary judgment, seeking summary judgment on several issues, including the right of Cascades to terminate the parties' contract upon 90 days' written notice. On November 3, 2021, Cascades filed a cross-motion for summary judgment, seeking summary judgment on the same issues.

¶ 18    On December 16, 2021, the trial court entered an order granting summary judgment in favor of Cascades on the issue of the right to terminate the contract upon 90 days' written notice. The trial court agreed with Topco that the effect of the 2018 agreement was to create a fixed-term contract which extended through September 30, 2021. The trial court, however, found that the 90-day termination provision in the 2004 agreement was not inconsistent with

this fixed-term contract, as the 2018 agreement set an expiration date for the parties' contract but did not affect the parties' right to terminate upon 90 days' notice. Accordingly, the trial court entered summary judgment in favor of Cascades and against Topco "on the major issue of whether either party had the contractual right to terminate upon 90 days written notice."

¶ 19                                                           *Trial*

¶ 20       After the grant of partial summary judgment, the parties prepared for trial on the remaining issues, namely, Cascades' counterclaims. On December 24, 2021, Cascades filed a supplemental response to Topco's discovery requests, identifying Fraser as a witness "who [has] information pertaining to Cascades's counterclaims, including damages sustained by Cascades as a result of its sale of products to Plaintiff for which Plaintiff did not pay."

¶ 21       Immediately prior to the commencement of trial, the trial court raised the issue of the prior grant of partial summary judgment, and Topco's counsel stated that "[t]he effect of the court's ruling in summary judgment is to determine that Cascades *** did not breach the contract that was the subject of Topco's breach of contract claim." As a result, counsel indicated that "we will not proceed with attempting to try the case in light of that ruling." The trial court accordingly entered judgment in favor of Cascades and against Topco on Topco's complaint, and indicated that the trial would proceed solely on the issue of Cascades' counterclaim against Topco for unpaid invoices.

¶ 22       The evidence presented at trial established that, during the 90-day termination period, Topco continued to order products from Cascades, which Cascades supplied, but Topco failed to pay for those goods, which Topco claimed was due to deficiencies in the orders and other performance issues.

¶ 23        Cascades' primary witness concerning its invoices was Fraser, the vice president of sales for its retail division. Prior to his testimony, Topco's counsel objected on the grounds that he was not properly disclosed as a Rule 213 witness. Topco's counsel noted that "[w]e covered this in the motions in limine,"[1] but Topco's position was that the failure to timely disclose Fraser as a Rule 213 witness required his exclusion as a witness. In response, the trial court indicated that "[w]e've ruled on this in our final pretrial conference on Thursday. The objection is overruled."

¶ 24        Fraser testified concerning Cascades' process for receiving and recording purchase orders, as well as recording payments received for orders. Fraser further identified the data Cascades recorded for Topco's account, which demonstrated that, after the date of the termination letter, Topco largely ceased paying for its purchases; Fraser identified 16 purchases for which Cascades had received no payment, worth $222,164.66. Fraser additionally testified that there were a number of purchases for which Cascades had received incomplete payments, identifying 62 such purchases for which a total of $136,223.67 remained unpaid.

¶ 25        The trial court ultimately entered judgment in favor of Cascades on the breach of contract count contained in its counterclaim, finding that Cascades delivered product to Topco and Topco refused to pay for the product. The trial court noted that Topco's defense was that Cascade breached the contract by failing to meet certain performance metrics but found that Topco had conceded that it could not establish that Cascades had breached its contract and further found that Topco was unsuccessful in proving the defense in any event. The trial court accordingly entered judgment in favor of Cascades and against Topco in the amount of

---

[1] The record on appeal does not include a transcript of any pretrial hearings.

$466,849.95. The trial court further noted that the contract allowed Cascades to recover its attorney fees, and permitted the filing of a fee petition.

¶ 26                                    *Fee Petition*

¶ 27        Cascades filed a petition for attorney fees and costs, seeking a total of $339,834.84. Topco objected to the fee amount, which it contended was "objectively unreasonable given the straightforward nature of the case and the total amount at issue." Specifically, Topco contended that (1) the hourly rates charged by Cascades' attorneys were unreasonably high, (2) the issues were not novel or complex and the fees sought did not bear a reasonable connection to the amount involved in the litigation, (3) the time spent preparing an opposition to a temporary restraining order—which Topco never sought—should be disallowed, (4) Cascades was not entitled to fees incurred prior to the filing of its counterclaim, (5) Cascades was not entitled to recover fees for its defense of Topco's complaint, (6) Cascades was not entitled to recover fees for paralegals and litigation support personnel who were not identified by title or role, and (7) Cascades' request was unreasonable and excessive, as it was "Double the Time and Amount of Fees Incurred by Topco." Topco further claimed that, at a minimum, the trial court should limit the fee award to $43,491.34 (if the trial court disallowed entirely the time not allocated between the complaint and the counterclaim) or $109,859.34 (if the trial court reduced such time by 50%).

¶ 28        In a written order, the trial court indicated that it had considered the factors set forth in Rule 1.5(a) of the Illinois Rules of Professional Conduct of 2010 and determined that a total fee award of $228,841.59 was warranted. In its order, the trial court reduced the fees sought by Cascades by (1) the fees spent preparing the opposition to a temporary restraining order which was never sought, (2) the fees sought for defense of Topco's claim, and (3) the fees

sought for the paralegals and litigation support personnel. With respect to the fees sought for defense of Topco's claim, the trial court found that it "agree[d] with Topco's argument that $184,712.50 of fees are indistinguishable between time spent on the defense of Topco's claim and the prosecution of Cascades' claim" and accordingly reduced the time by 50%. With respect to the paralegals and litigation support personnel, the trial court found that "Plaintiff has provided no information about who these individuals are, what their backgrounds are or any other information from which the Court could determine the reasonable [*sic*] for the fees sought."

¶ 29    Topco timely filed a notice of appeal, and Cascades timely filed a notice of cross-appeal.

¶ 30                                    ANALYSIS

¶ 31    On appeal, Topco contends (1) the trial court erred in granting summary judgment in favor of Cascades with respect to the complaint and (2) the trial court erred in permitting undisclosed witnesses to testify at trial. Both parties also appeal the attorney fee award, with Topco arguing that the attorney fees awarded to Cascades should have been further reduced and Cascades claiming that the trial court erred in reducing its fee award.

¶ 32    Topco first claims that the trial court erred in granting summary judgment in favor of Cascades with respect to the issue of whether Cascades was entitled to terminate the contract. A trial court is permitted to grant summary judgment only if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary

judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 33    Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt. *Id.* However, mere speculation, conjecture, or guess is insufficient to withstand summary judgment. *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively demonstrating that some element of the case must be resolved in his favor or by establishing that there is an absence of evidence to support the nonmoving party's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The purpose of summary judgment is not to try an issue of fact but to determine whether a triable issue of fact exists. *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (citing *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)).

¶ 34    Where, as here, the parties have filed cross-motions for summary judgment, "they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The mere filing of such cross-motions, however, does not establish that there is no genuine issue of material fact, nor does it obligate a court to render summary judgment. *Id.* We also note that we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 35    In this case, the trial court granted summary judgment based on its finding that the 2018 agreement did not affect the validity of the 2004 agreement's 90-day termination clause. As this question involves the construction and interpretation of a contract, it is a question of law

that is generally appropriate for disposition by summary judgment. *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 36.

¶ 36    The primary objective in construing a contract is to give effect to the parties' intent. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). In doing so, a court initially looks to the language of the contract, "as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* at 233. The contract must be construed as a whole, viewing each part in light of the others; the parties' intent "is not to be gathered from detached portions of the contract or from any clause or provision standing by itself." *Id.* Additionally, when parties agree to and insert language into a contract, "it is presumed that it was done purposefully, so that the language employed is to be given effect." *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011). Accordingly, a court will not interpret a contract in a manner which would nullify or render provisions meaningless, or in a way which is contrary to the plain and obvious meaning of the language. *Id.*

¶ 37    Parties to an existing contract may modify the contract by mutual assent, provided that the modification does not violate law or public policy. *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 468 (2004). Such modification normally occurs when the parties agree to alter a contractual obligation or impose additional obligations, "while leaving intact the overall nature and obligations of the original agreement." *Id.* The modified contract is regarded as creating a "new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed." *Id.* at 469. Where a modified contract contains a term which is inconsistent with a term of an earlier contract between the same parties, the modification is interpreted as including an agreement to rescind the inconsistent term in the earlier contract. *Id.*

¶ 38     Here, the parties agree that the 2018 agreement represented a modification of the 2004 agreement, and that the two should be read in conjunction. The parties disagree, however, on whether the fixed term provided by the 2018 agreement is inconsistent with the 90-day termination provision in the 2004 agreement. After examining the plain language of both the 2004 and 2018 agreements, we agree with Topco that it is, and therefore, the 2018 agreement operated to rescind the 90-day termination clause in the 2004 agreement.

¶ 39     The existence of both an expiration date and a termination clause in a contract is not unusual, nor is it necessarily problematic. Indeed, Cascades cites a number of cases in its brief on appeal in which courts have found that the two may coexist. See, *e.g.*, *Wilson v. Wilson*, 217 Ill. App. 3d 844 (1991) (consulting and development agreements); *Ohlemeier v. Community Consolidated School District No. 90*, 151 Ill. App. 3d 710 (1987) (employment contract); *Preston A. Higgins & Co. v. Stevenson*, 28 Ill. App. 3d 150 (1975) (lease). Thus, we would agree with Cascades' position were this simply a case in which the 2018 agreement added an expiration date to the terms of the 2004 agreement. That, however, is not the case here.

¶ 40     In the 2018 agreement, the parties also included a clause providing: "*The length of the partnership, shipments through September 30, 2021,* is a critical component for Cascades. The length of this partnership allows Cascades to strategically invest in new high-speed equipment to support our mutually aggressive growth plans." (Emphasis in original.) Neither the trial court nor Cascades' appellate brief meaningfully discusses the impact of this provision on the interpretation of the 2018 agreement. We are hard-pressed, however, to reconcile the statement that the length of the agreement was "a critical component" of the agreement with Cascades' contention that the parties were nevertheless able to terminate the agreement at any time upon

90 days' written notice. This is especially true where the parties went to the effort of highlighting this point, through the use of boldface type and the inclusion of an explanation as to the parties' reasoning on the matter. Simply put, if it was "critical" that the agreement continue until September 30, 2021, the possibility of early termination is entirely inconsistent with that concept.

¶ 41    In its brief, Cascades contends that this language is largely irrelevant, as "[h]ad the parties intended to remove their mutual right to terminate on 90 days' notice \*\*\*, they could easily have done so." As noted, however, when parties agree to and insert language into a contract, "it is presumed that it was done purposefully, so that the language employed is to be given effect." *Thompson*, 241 Ill. 2d at 442. Thus, there must be meaning to the parties' decision to expressly emphasize the fact that the continuation of the agreement through September 30, 2021, was "critical." The most natural reading of this language is to construe the 2018 agreement as replacing the 90-day termination clause with a fixed term which does not provide for early termination. To construe the 2018 agreement in any other way would operate to effectively ignore the parties' clear statement as to the importance of the contractual term, which we cannot do. See *id.* ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used."). Accordingly, as the trial court's grant of summary judgment was based on its finding that the parties were able to terminate the contract with 90 days' notice, we must reverse the grant of summary judgment and the trial court's resultant entry of judgment in favor of Cascades on Topco's complaint.

¶ 42    Based on our conclusion that summary judgment was improperly granted, we must reverse and remand the entire matter for a new trial, including on the issue of Cascades' counterclaim.

While Cascades' breach of contract counterclaim is largely separate from Topco's breach of contract claim, in Topco's answer and affirmative defenses, Topco alleged that Cascades was not entitled to any relief on its counterclaim due to its prior breach of contract. Thus, resolution of Topco's breach of contract claim is necessary in order to determine whether Cascades may succeed on its own breach of contract claim. See *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 70 (2006) ("Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations."). Accordingly, we have no need to consider the parties' remaining arguments as to admission of evidence at the trial or the attorney fee award.

¶ 43                                            CONCLUSION

¶ 44        For the reasons set forth above, we reverse the trial court's grant of summary judgment and its resultant entry of judgment in favor of Cascades and against Topco on Topco's complaint, as the 2018 agreement effectively rescinded the 90-day termination clause contained in the 2004 agreement. Accordingly, we remand the matter for a new trial on both Topco's complaint and Cascades' counterclaim.

¶ 45        Reversed and remanded.