**TROUT CREEK PROPERTIES, LLC, a Delaware limited liability company, and Trout Creek Development, LLC, a Delaware limited liability company, Plaintiffs,**

v.

**AKERMAN, SENTERFITT & EIDSON, P.A., a Florida professional association, Defendant.**

**No. 802CV190T30MSS.**

United States District Court, M.D. Florida, Tampa Division.

Nov. 6, 2003.

H. Vance Smith, Smith, Clark, Delesie, Bierley, Mueller & Kadyk, Tampa, FL, Daniel S. Mason, Zelle, Hofmann, Voelbel, Mason & Gette LLP, San Francisco, CA, for Trout Creek Properties, LLC, a Delaware limited liability company, plaintiff.

Benjamin H. Hill, III, Roy J. Ford, Jr., Lynn C. Hearn, Hill, Ward & Henderson, P.A., Tampa, FL, for Akerman, Senterfitt & Eidson, P.A., a Florida professional association, defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MOODY, District Judge.

THIS CAUSE comes before the Court upon Defendant Akerman, Senterfitt & Eidson, P.A.'s ("Akerman") Motion for Summary Judgment as to the Second Amended Complaint (Dkt.# 51) and sup-

porting memorandum of law (Dkt.# 52). The Plaintiffs, Trout Creek Properties, LLC and Trout Creek Development, LLC (collectively "Trout Creek"), filed a Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment (Dkt.# 54). The Court heard oral argument from counsel on September 8, 2003. Following oral argument, the parties filed supplemental memoranda of law (Dkts.# 62, 64).

## I. FACTUAL BACKGROUND

The basic facts of this case are not in dispute. In 1991, Trout Creek began developing 1700 acres of land it owned in Pasco County, Florida, into a residential community known as Meadow Pointe. In March of 1991, Trout Creek contracted with Devco II Corporation ("Devco"), a development company located in Tampa, Florida, to manage and develop Meadow Pointe. As part of its management and development responsibilities, Devco retained attorney Mark Straley to provide legal services and advice regarding Meadow Pointe. Straley, who had previously performed legal work for Devco, joined Akerman as a shareholder in July of 1991.[1]

To provide the infrastructure for Meadow Point, Trout Creek formed a community development district ("CDD") pursuant to Chapter 190 of the Florida Statutes. Chapter 190 authorizes the creation of independent special districts as an alternative method to manage and finance basic services for community development. These districts have the power to issue bonds and to levy both ad valorem taxes and non-ad valorem assessments. *See Fla. Stat.* §§ 190.016, 190.021.

1. The parties disagree about whether Akerman was employed by Devco or Trout Creek, and if Akerman solely represented Devco,

whether Trout Creek was a third party beneficiary of the legal services Akerman provided.

The Meadow Pointe CDD began issuing revenue bonds in 1992 to finance the cost of constructing Meadow Pointe's infrastructure. Specifically, the Meadow Pointe CDD issued Series A and Series B Capital Improvement Revenue Bonds. In order to repay the revenue bonds, the Meadow Pointe CDD levied non-ad valorem benefit special assessments upon the owners of Meadow Pointe property pursuant to § 190.021(2).[2] The bond documents required the Meadow Pointe CDD to collect the CDD special assessments through the Uniform Method for the Levy, Collection and Enforcement of Non-ad Valorem Assessments as provided for in § 197.3632, *Fla. Stat.* In order to implement the Uniform Method, the Meadow Pointe CDD entered into an agreement with the Pasco County Tax Collector on September 25, 1992. Under the terms of the agreement, in exchange for compensation, the tax collector billed and collected the CDD special assessments as part of the annual ad valorem tax bill.

Part of the legal services performed by Akerman included the preparation and review of the master form contract Trout Creek used in the sale of Meadow Pointe lots. The master form contract was prepared by John Price, in-house counsel with Trout Creek's parent company BF Enterprises, Inc., in collaboration with Straley. Paragraph 8 of the master form contract addresses the division of taxes and special assessments at closings:

> *Taxes and Assessments:* Taxes and assessments, including special assessments levied by the Meadow Pointe CDD relative to the Series A Capital Improvement Revenue Bonds, will be prorated between Buyer and Seller as of the closing date for each lot conveyed. At the respective closings hereunder, the Seller shall be responsible for paying in full the special assessment for the Series B Capital Improvement Revenue Bonds, and the Seller shall furnish the Buyer with a certificate from the Meadow Pointe CDD confirming that such special assessment has been paid in full.

As Devco began selling lots in Meadow Pointe on behalf of Trout Creek, the issue of how to prorate the CDD special assessments between the buyers and Trout Creek arose. In late 1992 or early 1993, Pamela J. Braun, a Devco employee, telephoned Straley requesting his advice on how the CDD special assessments should be prorated between Trout Creek and the buyer at closing. Straley advised Braun that the CDD special assessments should be prorated in the same manner as property taxes. Straley confirmed his advice in a letter to Braun dated January 21, 2003. The letter stated, in part:

> To confirm our telephone conversation, the special assessments at Meadow Pointe should be prorated in the same manner as real property taxes. In other words, for closings this year before the tax roll is certified by the Pasco County Tax Collector, the homebuyer (or builder) should receive credit for accrued real property taxes and special assessments from January 1, 1993 to the closing date. The new owner will receive the 1993 tax bill next November and will be fully responsible for paying the entire amount thereof. Thus, the credit at closing compensates the new owner for the seller's share of real estate taxes and special assessments.

---

2. The present dispute between the parties involves the proration of the CDD special assessments levied by the Meadow Pointe CDD relative to the Series A Capital Improvement Revenue Bonds.

Relying on Straley's advice, Trout Creek's practice thereafter was to prorate the CDD special assessments in the same manner as ad valorem property taxes. Between 1992 and June of 2001, Trout Creek employed the proration method based on Straley's advice in approximately 880 closings involving the sale of 2797 lots to various builders.

In June of 2001, Trout Creek completed the sale of a 40–acre commercial tract of property in Meadow Pointe. The June, 2001, commercial tract closing was handled by John Gibbons, an attorney who was not with the Akerman firm. Based on Gibbons advice, Trout Creek prorated the CDD special assessments differently from the way Straley advised. Gibbons prorated the CDD special assessments in advance based on the CDD's fiscal year, which runs from October 1 to September 30. This method of proration resulted in the buyer paying a much larger portion of the CDD special assessments than under Straley's method.

Following the June, 2001, commercial tract closing, Trout Creek amended the master form contract for the sale of property in Meadow Pointe to adopt the fiscal year proration method. The revised master form contract added the following sentence to paragraph 8:

> The method of proration shall take into account that property taxes are paid in arrears on a calendar year basis, and that the special assessments levied by the CDD are paid in advance on a fiscal year basis currently ending September 30.

## II. *PROCEDURAL BACKGROUND*

Trout Creek Properties, LLC originally filed a two count Complaint (Dkt.# 1) on February 1, 2002, seeking to recover damages in excess of $2 million arising out of Akerman's allegedly erroneous legal advice.[3] Count I sought recovery for legal malpractice under Florida common law and Count II alleged a breach of contract claim. Akerman moved to dismiss the Complaint (Dkt.# 4) on the grounds that the Plaintiff failed to allege that Trout Creek Properties, LLC employed Akerman or that Trout Creek Properties, LLC was a third party beneficiary of the legal services Akerman provided to Devco.

Trout Creek Properties, LLC filed an Amended Complaint (Dkt.# 7) in response to Akerman's motion to dismiss on April 1, 2002.[4] On March 19, 2003, a Second Amended Complaint (Dkt.# 41) was filed adding Trout Creek Development, LLC as a plaintiff.

Akerman moved for summary judgment as to the Second Amended Complaint on June 11, 2003. Akerman's motion asserts four separate bases for summary judgment: (1) the advice Akerman gave was correct; (2) Trout Creek's claims are barred by the doctrine of judgmental immunity; (3) Trout Creek's claims are barred by the applicable statute of limitations; and (4) Trout Creek's claims are barred because Trout Creek was not in privity with Akerman.

Trout Creek's response disputes all four grounds of Akerman's motion for summary judgment. Additionally, Trout Creek asserts in its response to Akerman's motion for summary judgment that Akerman improperly failed to advise Trout Creek that there were alternative methods for prorating the CDD special assessments. Specifically, Trout Creek asserts that even if the

---

**3.** The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**4.** The Court denied Akerman's motion to dismiss (Dkt.# 4) as moot on April 18, 2002.

advice Akerman gave concerning the proper way to prorate the CDD special assessments was correct, Akerman had a duty to advise Trout Creek that proration is a matter of contract between the buyer and seller and that the buyer and seller can agree to prorate the CDD special assessments however they choose. Trout Creek asserts that Akerman's failure to provide this advice constitutes legal malpractice and a breach of contract.

## III. *SUMMARY JUDGMENT STANDARD*

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in her favor. *Id.* at 255, 106 S.Ct. 2505.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir.1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir.1989).

## IV. *DISCUSSION*

### A. Taxes vs. Special Assessments

This case demonstrates the confusion that arises when parties treat ad valorem taxes and non-ad valorem assessments the same. In *City of Boca Raton v. State*, 595 So.2d 25, 29 (Fla.1992), the Florida Supreme Court explained the distinction between special assessments and taxes:

> [A] legally imposed special assessment is not a tax. Taxes and special assessments are distinguishable in that, while both are mandatory, there is no requirement that taxes provide any spe-

cific benefit to the property; instead, they may be levied throughout the particular taxing unit for the general benefit of residents and property. On the other hand, special assessments must confer a specific benefit upon the land burdened by the assessment. As explained in *Klemm v. Davenport*, 100 Fla. 627, 631–34, 129 So. 904, 907–08 (1930):

> A tax is an enforced burden of contribution imposed by sovereign right for the support of the government, the administration of law, and to execute the various functions the sovereign is called on to perform. A special assessment is like a tax in that it is an enforced contribution from the property owner, it may possess other points of similarity to a tax but it is inherently different and governed by entirely different principles. It is imposed upon a theory that that portion of the community which is required to bear it receives some special or peculiar benefit in the enhancement of value of the property against which it is imposed as a result of the improvement made with the proceeds of the special assessment. It is limited to the property benefitted, is not governed by uniformity and may be determined legislatively or judicially.

> It seems settled law in this country that an ad valorem tax and special assessment though cognate in immaterial respects are inherently different in their controlling aspects. (internal citations omitted).

Moreover, Florida Statutes specifically provide that (a) taxes are due and payable on November 1 of each year, *see* Fla. Stat. § 197.333; (b) taxes become delinquent on April 1 of the following year, *see id.;* and (c) the lien on the property against which the taxes have been assessed takes effect as of January 1 of the year the taxes were levied, *see* Fla. Stat. § 197.122(1).

## B. Chapter 190

In 1980, the Florida Legislature passed Chapter 190, extensive and detailed legislation governing the establishment of and operating procedures for community development districts. *See* Fla. Stat. ch. 190. Chapter 190 outlines community development districts' authorization to sell bonds and to levy and collect ad valorem taxes and non-ad valorem assessments. However, until 1999, Chapter 190 was silent about the central issues in this case: (1) what time period do special assessments cover; (2) are they paid in advance or in arrears; and (3) what is the date a lien for those special assessments takes effect?

In 1999, the Florida Legislature, realizing this problem, adopted § 190.021(9), which provides that special assessments:

> shall constitute a lien on the property against which assessed from the date of imposition thereof until paid, coequal with the lien of state, county, municipal, and school board taxes. These non-ad valorem assessments may be collected, at the district's discretion, by the tax collector pursuant to the provisions of s. 197.363 or s. 197.3632, or in accordance with other collection measures provided by law.

Chapter 190 also provides an efficient and effective method for levying and collecting special assessments using the county tax collectors. Under § 190.021, a CDD may certify the special assessment to the property appraiser who then enters the special assessment on the county tax rolls. The special assessment is then collected and enforced by the tax collector in the

same manner and at the same time as county taxes.

Alternatively, the CDD may choose to levy and collect the special assessments through § 197.3632, the "Uniform Method of Collection." In the present case, the Meadow Pointe CDD adopted the Uniform Method of Collection. The Uniform Method, like § 190.021, provides for the levying and collection of the special assessments through the county property appraisers and tax collectors. Under the Uniform Method, the CDD enters into a written agreement with the property appraiser and tax collector whereby the CDD agrees to reimburse the tax collector for necessary administrative costs incurred in levying and collecting the special assessments. Then, after several required steps, the tax collector mails a bill containing both the ad valorem taxes and non-ad valorem special assessments to the property owners.

## C. Trout Creek's Position

Trout Creek asserts that Akerman negligently provided incorrect legal advice concerning the proper proration of the CDD special assessments and that the incorrect legal advice resulted in a financial loss to Trout Creek. Trout Creek argues that special assessments are paid by the property owner in advance on a fiscal year basis (October 1 to September 30) and should be prorated accordingly. Trout Creek correctly maintains that prorating the CDD special assessments as if they are paid in arrears on a calendar year basis results in Trout Creek paying more of the CDD special assessment than if they were prorated based upon their payment in advance on a fiscal year basis.

For example, if the sale of a Meadow Pointe property closed on July 1, 2001, prorating the CDD special assessments based on Akerman's advice would result in Trout Creek crediting the buyer with the cost of six months of the CDD special assessment. This results from the fact that under Akerman's theory, the buyer would pay the CDD special assessment in arrears at some date after November 1 and therefore the buyer will be paying the CDD special assessment on the property for the sixth months it was owned by Trout Creek.

Trout Creek argues that the proper proration in this example is for the buyer not to receive any credit and for Trout Creek to receive credit for the cost of three months of the special assessment. Under Trout Creek's theory, Trout Creek already had paid the CDD special assessment for October 1, 2000 through September 30, 2001. Therefore, not only is the buyer not entitled to any credit, but Trout Creek is entitled to a credit for the three months of CDD special assessment it already paid because it will not own the property during those three months. Assuming that the CDD special assessment is $6,000 per year or $500 per month, in this example, Trout Creek would owe $3,000 under the Akerman proration theory, but would receive $1,500 under Trout Creek's theory, or a $4,500 difference.

Trout Creek presents scant legal support for its position that special assessments are paid in advance on a fiscal-year basis. Trout Creek primarily relies upon § 218.33 of the Florida Statutes, which requires all local governmental entities to operate on a fiscal year beginning on October 1 and ending on September 30. Trout Creek also relies on anecdotal evidence that other community development districts prorate special assessments in ad-

vance based on a fiscal-year basis.[5]

Trout Creek's reliance upon the fact that the Meadow Pointe CDD was required to operate on a fiscal year of October 1 through September 30 is flawed because almost every governmental and quasi-governmental agency and entity in Florida operates on this system whereby they budget for the upcoming fiscal year but receive revenue from a calendar tax year. Governmental entities and agencies routinely adopt budgets based on anticipated expenses and revenue. For example, a city normally adopts a budget that covers a fiscal year of October 1 through September 30, but that budget is funded, in part, by ad valorem taxes that are collected, by statute, for a calendar year period of January 1 through December 31.[6] But the fiscal year that the city uses to pay its expenses does not define the time period for which taxes or assessments are collected. Budgeting for a fiscal year is simply a process that assists in allowing governmental agencies and entities to operate in a fiscally sound manner.

### D. Akerman's Position

Akerman argues that the advice Straley gave in 1993 concerning the proper method to prorate the Meadow Pointe CDD special assessments was correct. Akerman bases its argument on § 197.3632(8)(a) of the Florida Statutes, which states:

> Non-ad valorem assessments collected pursuant to this section shall be subject

to all collection provisions of this chapter, including provisions relating to discount for early payment, prepayment by installment method, deferred payment, penalty for delinquent payment, and issuance and sale of tax certificates and tax deeds for nonpayment.

Akerman also notes that Fla. Stat. § 197.021(2), provides that assessments "shall be a lien on the property against which assessed until paid and shall be enforceable in like manner as county taxes."

Based on §§ 197.3632(8)(a) and 197.021(2), Akerman asserts that *all* non-ad valorem assessments, including the Meadow Pointe CDD special assessments, are subject to the exact same collection provisions as ad valorem taxes. Then, Akerman argues that the January 1 lien date contained in § 197.122(1) is a collection provision.[7] Akerman further argues that the January 1 lien date necessitates that all special assessments collected pursuant to the Uniform Method are levied in arrears based on a calendar year beginning January 1. Akerman contends that the lien for the Meadow Pointe CDD special assessments attaches on January 1, and when the property is sold after that date, the Meadow Pointe CDD special assessments must be prorated based on the portion of the year that the buyer and seller owned the property after January 1.

Akerman cites several non-judicial authorities issued after Straley's January,

---

**5.** The Court is not persuaded by Trout Creek's anecdotal evidence.

**6.** Had the Meadow Pointe CDD elected to levy ad valorem taxes under § 190.021(1), it would have followed this same process.

**7.** Section 197.122(1) states, in part, that: "All taxes imposed pursuant to the State Constitu-

tion and laws of this state shall be a first lien, superior to all other liens, on any property against which the taxes have been assessed and shall continue in full force from January 1 of the year the taxes were levied until discharged by payment or until barred under chapter 95."

1993, opinion to support its position. *See* Fla. Dept. Rev. Opinion 98–005 (1998) ("[n]on-ad valorem assessments are subject to all collection provisions of chapter 197, including the lien date provision which is 197.122"); Op. Att'y Gen. Fla.2000–69 (2000) (noting that the Department of Revenue had advised that the district levying special assessments may not simply forgive unpaid special assessments but must follow provisions of § 197.122 and administrative rules); Op. Att'y Gen. Fla. 94–13 (1994) (future annual non-ad valorem assessments do not attach until January 1 of that future year, and would not, therefore, become a lien until that time); Op. Att'y Gen. Fla. 99–31 (1999) (section 197.122(2) is the exclusive method for enforcing liens created through the sale of tax certificates for unpaid special assessments and taxes); Op. Att'y Gen. Fla. 97–51 (1997) (section 197.122(2) is the exclusive method for enforcing liens created through the sale of tax certificates for unpaid special assessments and taxes). Although Akerman acknowledges the parties did not have the benefit of these opinions in January of 1993, it asserts that these opinions confirm the accuracy of Straley's advice.

Akerman also argues that § 190.021(9), although added well after Straley's advice was given, supports its position. Akerman asserts that the term "from the date of imposition" means the date the special assessments are levied. Akerman contends that, under its theory, since special assessments collected pursuant to the Uniform Method are levied, or imposed, effective January 1, § 190.021(9) creates a lien date of January 1.

**E.   Accuracy of Akerman's Advice**

Akerman offers a reasonable argument for its position that special assessments are paid in arrears on a calendar year basis with a lien date of January 1. Because Chapter 190 didn't provide a specific time period or lien date for CDD special assessments, Akerman's interpretation that they are paid in arrears based on a calendar year beginning January 1 like ad valorem taxes is tenable. The Court notes that it is the same interpretation reached by the Florida Department of Revenue and the Florida Attorney General's Office.

But Akerman's theory that, prior to the adoption of § 190.021(9), *all* non-ad valorem special assessments were paid in arrears on a calendar year basis with a lien date of January 1 is incorrect. While Akerman's reasoning may support a practical result, it is legally flawed because a lien date is a substantive right, not a "collection provision." [8]  Collecting special assessments along with ad valorem taxes, and even treating them co-equally for collection purposes, does not create a lien date. Special assessments are different from ad valorem taxes. The legislature specifically provided a January 1 lien date for ad valorem taxes, but was silent as to special assessments. Absent a specific statutory provision, special assessments do not have a lien date of January 1.

Moreover, the addition of § 190.021(9) did not create a lien date of January 1 for all special assessments. The 1999 amendment, rather than provide a specific lien date, provides that special assessments shall constitute a lien "from the date of imposition." Section 190.021(9) does not define the term "imposition." The Court finds Akerman's contention that the "date of imposition" is equivalent to the "date of levy" persuasive. Section 197.3632(1)(a) defines the term "levy" to mean "the impo-

---

8.   The creation of a lien upon real property is a matter of substantive, not procedural, law.

*See Hott Interiors, Inc. v. Fostock*, 721 So.2d 1236, 1239 (Fla. 4th DCA 1998).

sition of a non-ad valorem assessment." But the Court rejects Akerman's theory that all special assessments, once levied, are entitled to a January 1 lien date. If the Florida Legislature had intended to create a January 1 lien date for all special assessments, they could have specifically done so. *See* § 190.024, *Fla. Stat.*[9]

Additionally, Akerman's theory conflicts with the plain language of § 197.3632. Section 197.3632(4)(a) requires that the special district adopt the non-ad valorem assessments at a public hearing held between June 1 and September 15 under four circumstances. One of those circumstances is when the non-ad valorem assessment is levied for the first time. *See* § 197.3632(4)(a)(1), *Fla. Stat.* Section 197.3632(4)(b) requires that the special district provide notice of the public hearing by United States Mail to each person owning property that is subject to the special assessment at least 20 days prior to the public hearing. Section 197.3632(4)(b) also requires that the notice contain "the total amount *to be levied* against each parcel" (emphasis added). Section 197.3632(8)(b) states that within 30 days of the public hearing, "any person having any right, title or interest in any parcel against which *an assessment has been levied* may elect to prepay the same in whole" (emphasis added). The plain language of § 197.3632 indicates that the act of "levying" the special assessments occurs at the public hearing, which must take place between June 1 and September 15. There is no statutory provision that makes the levying "effective" on any other date. Therefore, Akerman's theory that all special assessments are given a January 1 lien date cannot be harmonized with § 197.3632.

However, the Court agrees that the calendar year time period is appropriate for the assessment of the particular CDD special assessments *in this case*, but for a reason different than offered by Akerman, the Florida Department of Revenue and the Florida Attorney General's Office. Although it is clear that special assessments collected pursuant to the Uniform Method are due on November 1, Chapters 190 and 197 still do not answer the critical question of what the appropriate proration of special assessments is absent the parties contracting for a specific proration. It appears that prior to the adoption of § 190.021(9), the special assessment would be due when imposed by appropriate vote of the CDD assessing authority, unless the district resolution, charter or bond authority provided another date. But it remains unclear what period of time the special assessment would cover. Because Chapters 190 and 197 did not address the issue in 1993, the Court must look to the specific documents in this case to determine the appropriate time period and lien date for the Meadow Pointe CDD special assessments.

The Meadow Pointe CDD charter is silent on the issue. But the Meadow Pointe CDD Board of Supervisors' resolutions and bond documents, while not a model of clarity, do indicate an intent that the CDD special assessments cover a twelve (12) month period coexistent with the calendar year. Specifically, Meadow Pointe CDD Board of Supervisors' Resolution 91–7, dated October 17, 1991, states: "Commencing with the year the Assessments are confirmed, the Series A Assessments shall be paid in not more than twenty (20)

---

**9.** Section 190.024, *Fla. Stat.,* states, in part, that all taxes "shall, from January 1 for each year the property is liable to assessment and until paid, constitute a lien of equal dignity . . ."

annual installments payable at the same time and in the same manner as are ad valorem taxes as prescribed by Chapter 197, Florida Statutes."

Additionally, the February 1, 1992, limited offering memorandum for the Meadow Pointe CDD's 1992 bond issue provides:

> The Assessments will be payable in annual installments and will be levied by the District each year.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The Florida statutes provide that subject to certain conditions, special assessments may be collected in the same manner as county and ad valorem taxes. The statutes relating to enforcement of county taxes provide that county taxes become due and payable on November 1 of the year when assessed and constitute a lien upon the land from January 1 of such year. The Tax Collector is to bill such taxes together with all other County taxes, and landowners in the District are required to pay all such taxes without preference in payment of any particular increment of the tax bill, such as the increment owing for the Assessments. Upon receipt of moneys from the Tax Collector, such moneys will be deposited to the Revenue Fund under the Indenture.

Despite their numerous legal differences, Resolution 91–7 and the offering memorandum treat ad valorem taxes and non-ad valorem assessments the same.

The Resolution and offering memorandum indicate that the Meadow Pointe CDD intended the CDD special assessments to be treated the same as ad valorem taxes, meaning they were to cover a twelve (12) month period beginning January 1.[10] Therefore, Straley's advice to Devco regarding the proper proration of the Meadow Pointe CDD special assessments was correct (although based on reasoning that differs from that of the Court). Any advice advocating prorating the Meadow Pointe CDD special assessments in advance on a fiscal year basis is incorrect and not supported by Chapter 190, the Meadow Pointe CDD charter, resolutions or bond documents.

### F.　Trout Creek's Contractual Theory

■ Having determined that Akerman's advice to Devco in 1993 was accurate,[11] the Court now turns to Trout Creek's allegations that Akerman had a duty to advise Trout Creek that it could contract to another method of prorating the CDD special assessments. All closing costs may be prorated however the parties wish, even on a basis that may conflict with established law. It is self evident that parties can agree and contract to whatever they choose. For example, a buyer could agree to pay all closing expenses, including those normally prorated to the seller, and could even agree to pay additional expenses not usually involved in a closing. Altering the allocation of closing costs is just another method of altering the purchase price of

---

10. For other community development districts, the time period may well be different. The period would begin from date of imposition, which this Court determines to be the date of final adoption by a district or other such date specified in the assessment resolution and covering the period of time specified in the resolution, district charter or bond documents.

11. Because the Court finds that Akerman's advice was correct, it does not decide the three remaining issues raised by the motion for summary judgment.

the property.[12]

Trout Creek was aware that parties may contractually allocate closing costs however they wish. In the master form contract, the buyer and Trout Creek agreed to contractually alter the proration of a portion of the closing costs. Paragraph 8 states that Trout Creek would "be responsible for paying in full the special assessment for the Series B Capital Improvement Revenue Bonds, and the Seller shall furnish the Buyer with a certificate from the Meadow Pointe CDD confirming that such special assessment has been paid in full." Rather than prorate the Series B bonds, the parties contractually agreed that Trout Creek would pay them in their entirety. For Trout Creek to now argue that they were unaware of their ability to contractually alter the proration of the CDD special assessments appears disingenuous. Therefore, the Court finds that Akerman's failure to advise Trout Creek that it could alter the traditional allocation of closing costs does not create a cause of action for legal malpractice. *See, e.g.,* *McCarty v. Browning,* 797 So.2d 30, 31 (Fla. 3d DCA 2001) (attorney is not required to investigate and analyze every conceivable issue related to the task the attorney was retained to perform).

It is therefore ORDERED AND ADJUDGED that:

1. Defendant Akerman, Senterfitt & Eidson, P.A.'s ("Akerman") Motion for Summary Judgment as to the Second Amended Complaint (Dkt.# 51) is GRANTED.

2. The Clerk is directed to enter final judgment in favor of the Defendant and against the Plaintiffs, together with taxable costs.

3. **The Clerk is directed to close this case and terminate all pending motions as moot.**

---

12. It is unknown whether the Meadow Pointe property buyers would have purchased the Meadow Pointe lots if Trout Creek had increased the purchase price by altering the proration of the CDD special assessments.