2023 IL App (1st) 221400-U
Order filed: August 24, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1400

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| GEORGE GIALAMAS, THOMAS MANOS, DDS, MS, JOHN VELERIS and ANNA GONIS O'CONNOR, individually and as Trustees of the Third Restatement of the John G. Gonis 1979 Declaration of Trust, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | No. 2013 CH 19182 |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| DIANE M. DEACON and VINCENT APRUZZESE, | ) ) ) | Honorable Alison C. Conlon, |
| Defendants-Appellants. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Lampkin and Justice Hoffman concur in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court entered orders granting plaintiffs summary judgment and equitable relief on their complaint for enforcement of a settlement agreement. We affirmed in part, reversed in part, and remanded.

¶ 2    This appeal arises from litigation between plaintiffs, George Gialamas, Thomas Manos, John Veleris, and Anna Gonis O'Connor, who are trustees of the Estate of the John G. Gonis 1979

Declaration of Trust (Trust), and defendants Diane Deacon, a beneficiary of the Trust, and Vincent Apruzzese, who is Deacon's attorney. In 2011, the litigation culminated in a written settlement agreement between the parties, including confidentiality and non-disclosure provisions, which defendants allegedly violated. Plaintiffs filed a lawsuit to enforce the settlement agreement. The circuit court entered an order granting summary judgment in favor of plaintiffs, as well as orders awarding plaintiffs injunctive relief and requiring specific performance from defendants. Defendants appeal the court's orders. For the reasons that follow, we affirm in part, reverse in part, and remand.

¶ 3    The undisputed facts show that at the time of his death in February 2008, Dr. John Gonis owned a dental practice appraised at $22 million and real estate valued at over $3 million. Pursuant to his will, his assets, including his dental practice, poured over into the Trust, of which plaintiffs were the trustees. Dr. Gonis named Deacon as one of the beneficiaries of the Trust. Under the terms of the Trust, Deacon was to receive a fractional share of the Trust not to exceed $3 million, as well as the "entire interest (free and clear of all liens and encumbrances)" in a condominium located at 14117 Ventanas Court in Bonita Springs, Florida (the Bonita Springs condominium).

¶ 4    Plaintiffs refused to distribute to Deacon the fractional share of the Trust or the Bonita Springs condominium. In August 2010, Deacon filed her second amended complaint in the circuit court of Cook County (the Illinois litigation), accusing plaintiffs of misconduct in administering Dr. Gonis' estate (the Estate) and the Trust and in valuing Dr. Gonis' assets. Meanwhile, in June 2010, Anna Gonis O'Connor, as personal representative of Dr. Gonis, filed a complaint against Deacon in Florida (the Florida litigation) seeking to evict Deacon from the Bonita Springs condominium and to recover back rent.

¶ 5    During the pendency of the Illinois and Florida litigation, the IRS initiated an audit of the Estate's tax return. On July 7, 2010, Apruzzese sent a letter to the IRS on behalf of Deacon, informing it that plaintiffs had filed federal Form 706, "United States Estate and Generation-Skipping Transfer Tax Return" on May 23, 2009, which "grossly underestimates" the value of the Estate. Apruzzese stated "[w]e stand ready to cooperate with you in any way you deem appropriate."

¶ 6    On August 30, 2010, Apruzzese sent a second letter to the IRS in which he attached a copy of the operative complaint in the Illinois litigation and stated:

> "[The complaint] very clearly sets forth the issues being attacked in the administration of the John Gonis Estate which all bear on the valuations set forth in the Form 706, United States Estate Tax Return, filed in this matter. As is fairly obvious, there are many millions of dollars at issue. I trust this will prove helpful in your audit."

¶ 7    On November 23, 2010, Apruzzese sent a third letter to the IRS, complaining that plaintiffs had sold Dr. Gonis' dental practice for $14.6 million, "substantially below" its appraised value of $22 million and had failed to "submit proper accountings" for tax purposes.

¶ 8    In March 2011, the parties entered into a signed settlement agreement settling the Illinois and Florida litigation. Under paragraph two, plaintiffs agreed to pay Deacon $3 million for her fractional share of the Trust. Paragraph three provided that with respect to the Bonita Springs condominium, plaintiffs "agree to pay off any mortgages and otherwise eliminate all other encumbrances on the property in order to transfer clear title by warranty deed" to Deacon.

¶ 9    Paragraph 12 provided that the parties agreed to return or destroy certain documents provided to them in the Illinois litigation. Paragraph 12 further stated:

"In no event shall any information gained exclusively from any of the above-mentioned documents be provided to any third party for any reason, except as required by law. To the extent any information contained in any of the above-mentioned documents was already known to the Parties prior to the initiation of the Illinois Litigation, the obligations of this Paragraph do not apply."

¶ 10    Paragraph 13 stated:

"Confidentiality Provisions. The Parties agree that, except as provided herein, the terms and conditions of this Settlement Agreement, and the content of all prior discussions between the Parties relating to this Settlement Agreement, the Florida Litigation, the Illinois Litigation, and any other litigation (collectively, 'Litigation') between the Parties, shall remain confidential. Additionally, neither the Parties nor their representatives shall communicate with anyone other than each other concerning the Litigation [subject to four exceptions not at issue here]."

¶ 11    Paragraph 14 stated:

"[Deacon] agrees that neither she, nor anyone acting within her control or otherwise acting as her agent or for or on her behalf, will have any voluntary communications of any type or kind with any regulatory or governmental body or agency regarding the Trust, any of the other Parties to this Settlement Agreement, or the subject matter of the Illinois or Florida Litigations, other than as may be required by law or subpoena."

¶ 12    Paragraph 15 provided that in the event that the Trustees failed to fulfill their obligations under paragraphs two and three, then paragraphs 13 and 14 will be deemed null and void.

¶ 13    Pursuant to the settlement agreement, plaintiffs paid $3 million to Deacon and transferred title to the Bonita Springs condominium to her.

¶ 14     On October 31, 2011, the IRS notified plaintiffs that it was closing its investigation of the Estate and assessed additional estate taxes, penalties and interest.

¶ 15     In December 2011, Apruzzese demanded that plaintiffs reimburse Deacon for certain annual assessments on the Bonita Springs condominium, which allegedly constituted unpermitted "encumbrances" in violation of the requirement in paragraph three of the settlement agreement that plaintiffs transfer clear title to Deacon. We will more fully discuss the assessments later in this order.

¶ 16     Plaintiffs responded to Apruzzese's demand by asserting that they were not required to reimburse Deacon for the assessments under the settlement agreement. After learning of plaintiffs' refusal to pay the assessments, defendants authored a 210-page manuscript entitled "Conniving Trustees" detailing plaintiffs' alleged misconduct in administering the Estate and Trust and underpaying Estate taxes. Defendants stated their intent to publish the manuscript in book and audio form and eventually turn the book into a movie.

¶ 17     On September 4, 2011, Apruzzese filed on behalf of himself and Deacon an Application for Award for Original Information with the IRS (whistleblower application), reiterating the concerns he had previously disclosed to the IRS regarding the underestimation of the Estate for tax purposes. The IRS gave Apruzzese a pending whistleblower claim number 2011-012502, and it gave Deacon a pending whistleblower claim number 2011-012501.

¶ 18     In February 2017, the IRS notified defendants that it had collected $424,018.62 in additional taxes, interest and penalties from the Estate and that it determined that defendants were entitled to over $43,000 in whistleblower payments.

¶ 19     In April 2017, Apruzzese filed a *qui tam* action against plaintiffs on behalf of the State of Illinois, under the Illinois False Claims Act (740 ILCS 175/1 *et seq*. (West 2016). The April 2017

complaint generally alleged that defendants failed to remit and report estate tax on Dr. Gonis' property within Illinois. The circuit court dismissed the complaint with prejudice. This court affirmed. See *People ex rel. Apruzzese v. Gialamas*, 2020 IL App (1st) 182216-U.

¶ 20    In May 2017, Apruzzese filed a petition with the United States Tax Court seeking a redetermination of the $424,018.62 tax liability for the Estate, arguing that the tax liability should have been determined to be at least $48 million. On October 21, 2019, the Tax Court granted summary judgment for the IRS. See *Apruzzese v. Commissioner of Internal Revenue*, T.C. Memo 2019-141. The Tax Court's order was affirmed on appeal. See *Apruzzese v. Commissioner of Internal Revenue*, 811 Fed. Appx. 1 (D.C. Cir. 2020).

¶ 21    Meanwhile, plaintiffs brought a second amended complaint against defendants to enforce the confidentiality provisions of the settlement agreement and prevent publication of their manuscript. Count I sought an injunction preventing defendants from publishing the manuscript. Count II alleged that defendants' threatened publication of the manuscript was a breach of the settlement agreement. Count III sought an order requiring defendants to specifically perform their "confidentiality obligations" under the settlement agreement. Count IV sought, in the alternative, rescission of the settlement agreement based on defendants' breach thereof. Count V sought, in the alternative, damages against defendants for unjust enrichment.

¶ 22    Defendants filed several affirmative defenses; the first and fourth ones are at issue here. The first affirmative defense asserted that plaintiffs breached the settlement agreement by failing to deliver clear title to the Bonita Springs condominium, thereby rendering paragraphs 13 and 14 null and void.  The fourth affirmative defense argued that paragraph 14 is void because it offends the public policy of encouraging reporting of unlawful conduct to law enforcement.

¶ 23 The circuit court granted summary judgment in favor of plaintiffs on the first and fourth affirmative defenses.

¶ 24 On November 9, 2021, plaintiffs filed a motion for summary judgment on "all remaining case issues." Issue one asked whether defendants breached any provision of the settlement agreement. Issue two asked whether plaintiff Anna Gonis O'Connor was entitled to recover any nominal damages in connection with defendants' breaches of the settlement agreement. Issue three asked whether plaintiffs were entitled to an order compelling defendants' specific performance of the settlement agreement. Issue four asked whether plaintiffs were entitled to a permanent injunction with respect to defendants' obligations under the settlement agreement.

¶ 25 As to issue one, the court granted summary judgment for plaintiffs, finding that defendants breached paragraphs 12, 13, and 14 of the settlement agreement. The court denied summary judgment for plaintiffs on issue two, finding that Anna Gonis O'Connor was not entitled to recover any nominal damages.

¶ 26 The court granted summary judgment for plaintiffs on issue three and entered the following order of specific performance: defendants were required to destroy certain specified documents in their possession related to the Illinois litigation and bates labeled with a "GO" prefix; defendants must dismiss with prejudice any litigation, including their pending whistleblower claims in claim number 2011-012502 (Apruzzese) and 2011-012501 (Deacon) and *qui tam* claims, which: (i) concern, arise out of, and/or relate to the settlement agreement, the Florida litigation, the Illinois litigation, and/or the Trust; and (ii) are based on any event or matter occurring prior to the date of the settlement agreement, including any matters alleged in the Illinois and Florida litigations or otherwise relating to the financial affairs and/or estate plans of Dr. Gonis. Defendants also must withdraw, with prejudice, their pending whistleblower claims, including forfeiting whistleblower

rewards previously awarded to them by the IRS, and clawback any copies of the manuscript sent to any person or entity.

¶ 27    As to issue four, the circuit court also entered the following permanent injunction order: enjoining defendants from obtaining, from any source, the GO documents; enjoining defendants from using any of the GO documents "for any reason whatsoever" or providing any information gained exclusively from the GO documents to any third party, except as required by law, and except to the extent any information contained in any of the GO documents already was known to defendants; enjoining defendants from initiating or engaging in any litigation, including their pending whistleblower claims in claim numbers 2011-012501 and 2011-012502 and/or *qui tam* claims (i) arising out of or relating to the settlement agreement, the Florida litigation, the Illinois litigation, and/or the Trust and (ii) based on any event or matter occurring prior to the date of the settlement agreement, including any of the matters alleged in the Illinois and Florida litigations or otherwise relating to the financial affairs and/or estate plans of Dr. Gonis; and enjoining defendants from publishing or disseminating the manuscript and/or any portions thereof in any form.

¶ 28    The circuit court concluded that "[t]his Order, together with the Order contemporaneously entered by the Court disposing of Plaintiffs' summary judgment motion, is a final order and this case is disposed."

¶ 29    On appeal, defendants argue that the court erred by entering summary judgment for plaintiffs on the fourth affirmative defense and entering orders for a permanent injunction and specific performance, which enforced paragraph 14 of the settlement agreement. As discussed, paragraph 14 prevents defendants from voluntarily communicating with any regulatory or governmental body regarding the Trust or the subject matters of the Illinois or Florida litigations. Defendants contend that the court should have granted summary judgment in their favor on the

fourth affirmative defense because paragraph 14 violated the public policy encouraging whistleblowers to report illegal conduct.

¶ 30    Summary judgment is appropriate when the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Northbrook Bank & Trust Co. v. 2120 Division LLC*, 2015 IL App (1st) 133426, ¶ 38. Review is *de novo*. *Id.*

¶ 31    Permanent injunction orders are reviewed under a manifest weight standard. *C.J. v. Department of Human Services*, 331 Ill. App. 3d 871, 878 (2002). Specific performance orders are reviewed for an abuse of discretion. *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 477 (2004).

¶ 32    Settlement agreements, including confidentiality provisions, are presumed valid and enforceable. *Jordan v. Knafel*, 355 Ill. App. 3d 534, 540 (2005). However, courts will not enforce a private contract, such as a settlement agreement, if it is contrary to public policy. *Swavely v. Freeway Ford Truck Sales, Inc.*, 298 Ill. App. 3d 969, 976 (1998). "Public policy is the legal principle that no one may lawfully do that which has the tendency to injure the welfare of the public. The public policy of the state is reflected in its constitution, statutes and judicial decisions." *Id.*

¶ 33    It is in the public interest that persons should not be unnecessarily restricted in their freedom to make their own contracts, and therefore the power to declare a private contract invalid on public policy grounds is "exercised sparingly." *Country Preferred Insurance Co. v. Whitehead*, 2012 IL 113365, ¶ 28. The courts apply a strict test in determining whether a contract violates public policy. *Swavely*, 298 Ill. App. 3d at 976. Because public policy strongly favors an

individual's freedom to contract, a contract will not be declared illegal unless it " '*expressly* contravenes the law or a known public policy of this State.'" (Emphasis added.) *Id.* at 976-77. (quoting *Holstein v. Grossman*, 246 Ill. App. 3d 719, 726 (1993). "An agreement will not be invalidated unless it is clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy of Illinois, or unless it is manifestly injurious to the public welfare." *Whitehead*, 2012 IL 113365, ¶ 28. Whether a contract violates public policy depends on the particular facts and circumstances of the case. *Id.*

¶ 34    Defendants argue that paragraph 14 of the settlement agreement violates the public policy encouraging whistleblowers to report illegal conduct to "the proper authorities." In support, defendants cite the following case law: *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 132 (1981) (holding that public policy favors citizens reporting crimes); *Jordan*, 355 Ill. App. 3d at 540 and *Cosby v. American Media, Inc.*, 197 F. Supp. 3d 735 (E.D. Penn. 2016) (contracts preventing individuals from reporting criminal conduct violate public policy); *SEC v. Lipson*, 1997 WL 801712 (N.D. Ill. 1997) (contract preventing cooperation with the SEC violated public policy); *United States v. Cancer Treatment Centers of America*, 350 F. Supp. 2d 765 (N.D. Ill. 2004) (contract preventing disclosure of fraud against the government violated the False Claims Act's strong public policy of protecting such whistleblowers); *Equal Employment Opportunity Commission v. Astra USA, Inc.*, 94 F. 3d 738 (1st. Cir. 1996) (contractual provision prohibiting voluntary cooperation with EEOC violated public policy). Defendants also cite the Dodd-Frank Act, 15 U.S.C. § 78u-6, which protects whistleblowers from retaliation for reporting violations of federal securities laws, and the Defend Trade Secrets Act, 18 U.S.C. § 1833(b)(1), which protects whistleblowers who reveal trade secrets.

¶ 35    In contrast to all the cases and statutes cited above, the settlement agreement was only entered *after* defendants took *three* opportunities (in letters sent to the IRS on July 7, 2010, August 30, 2010, and November 23, 2010) to blow the whistle on plaintiffs' alleged mismanagement of the Estate and Trust and their underpayment of taxes. Defendants also filed a *qui tam* action in the circuit court and a petition with the Tax Court again related to plaintiffs' alleged mismanagement and underpayment of taxes and filed appeals from the adverse decisions entered against them in those actions. Thus, this is not a case where paragraph 14 prevented defendants from reporting plaintiffs' alleged unlawful activity, thereby injuring the public welfare. To the contrary, the IRS heard plaintiffs' claims and eventually collected over $400,000 in additional taxes from the Estate. The IRS has since completed its investigation and closed the audit of the Estate.

¶ 36    Defendants contend that the circuit court's enforcement of paragraph 14 prevents them from blowing the whistle on some additional concerns that have not yet been reported, specifically, on plaintiffs' allegedly false assertion that Dr. Gonis' domicile at the time of his death was in Florida. Defendants argue that plaintiffs' false assertion of Dr. Gonis' Florida domicile enabled them to pay estate taxes only in Florida and not in Illinois, thereby depriving Illinois of significant tax revenue. Defendants' argument is not well-taken, as they concede that plaintiffs have since filed an Illinois estate tax return, thereby enabling Illinois to recover the lost revenue.

¶ 37    Based on the particular facts and circumstances of *this* case, and balancing the competing public policies of freedom to contract and encouragement of whistle-blowing, we find that defendants have not clearly shown that the balance favors invalidation of paragraph 14 of the settlement agreement. This is especially so where the settlement agreement was only entered into *after* defendants had made multiple whistleblower reports to the IRS. Thus, the settlement agreement did not serve to conceal defendants' alleged misconduct or otherwise cause injury to

-11-

the public welfare. Accordingly, we affirm the order of summary judgment in favor of plaintiffs as well as the award of specific performance and permanent injunction premised on paragraph 14's terms.

¶ 38    Next, defendants argue that the court erred by entering summary judgment for plaintiffs on counts I and II of their amended complaint, finding that paragraph 13 of the settlement agreement bars publication of their manuscript. Defendants also argue that the court erred by entering an order of specific performance requiring them to clawback any copies of the manuscript sent to any persons, and enjoining defendants from publishing the manuscript in any form.

¶ 39    A settlement agreement is a contract, the construction of which is governed by principles of contract law. *Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301 (2006). The primary objective when construing a contract is to ascertain and give effect to the parties' intent, the best indicator of which is the plain language of the contract. *Id.* The interpretation of a contract is a question of law which we review *de novo*. *Id.*

¶ 40    As discussed earlier in this order, paragraph 13 contains two prongs. The first prong provides that the terms and conditions of the settlement agreement, as well as the content of all prior discussions between the parties relating to the settlement agreement, the Illinois litigation, and the Florida litigation (collectively "Litigation") "shall remain confidential." The second prong provides that the parties shall not communicate with anyone other than each other "concerning the Litigation" (subject to certain exceptions not applicable here).

¶ 41    Defendants' intended publication of the manuscript to the general public (both as a book and as a movie) would violate both prongs of paragraph 13, as the manuscript references both the Litigation and the settlement agreement in contravention of paragraph 13's confidentiality provisions. Accordingly, the court did not err by granting summary judgment for plaintiffs and

entering the specific performance and injunctive orders preventing the publication of the manuscript in its current form and requiring defendants to clawback any manuscripts sent to any person. However, the court's order went too far in preventing defendants from disseminating "any portions" of the manuscript, even portions completely unrelated to the Litigation and settlement agreement. We reverse that portion of the order and remand for the circuit court to enter a modification allowing defendants to disseminate portions of the manuscript completely unrelated to the Litigation and settlement agreement. When entering the modified order, the circuit court may take any additional protective steps it deems necessary to ensure that *only* portions of the manuscript unrelated to the Litigation and settlement agreement are disseminated, including requiring defendants to send plaintiffs the manuscript portions for their review and approval prior to dissemination.

¶ 42 Defendants argue, though, that in construing a contract we must read it as a whole (see *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011)) and they direct our attention to paragraph 12, which provides that any information "gained exclusively" from the GO documents may not be provided to any third party for any reason except as required by law. Paragraph 12 further states that to the extent any information contained in those documents already was known to the parties prior to the initiation of the Illinois litigation, "the obligations of this Paragraph do not apply." Defendants argue that when paragraphs 12 and 13 are read together, they indicate an intent to prohibit publication only of information gained exclusively from the Illinois litigation and not of information known prior thereto. Defendants contend that the court's summary judgment and injunctive orders go too far in prohibiting them from publishing information about the Illinois litigation which they already knew.

¶ 43    We do not agree with defendants' construction of the settlement agreement. Paragraph 12 relates only to how the parties were to disclose certain documents produced during the Illinois litigation and specifically prevents the parties from disclosing to third parties any information gained exclusively from those documents. Paragraph 13 contains a far broader confidentiality agreement relating to the entire Litigation (constituting both the Illinois and Florida litigations), preventing the parties from disclosing *any* information about the Litigation, regardless of when that information was learned. Defendants' construction of the settlement agreement would require us to effectively rewrite paragraph 13 so as to limit the confidentiality provision in a way not intended by the parties. This we cannot do. See *Gallagher*, 367 Ill. App. 3d at 301 ("a court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented").

¶ 44    Defendants also argue that the court's summary judgment and injunctive orders go too far in barring them from publishing publicly available information. Specifically, defendants argue that their manuscript contains information from the Illinois complaint filed in the circuit court, which is available to the general public and subject to common law and first amendment rights of access which should not be abridged. See *Fidelity Financial Services, Inc. v. Hicks*, 267 Ill. App. 3d 887, 892 (1994); *In re Marriage of Johnson*, 232 Ill. App. 3d 1068, 1074 (1992) (holding that once documents are filed with the court, they lose their private nature and become part of the court file and public components of the judicial proceeding to which the right of access attaches).

¶ 45    The circuit court's orders enforcing paragraph 13 of the settlement agreement and enjoining defendants from publishing information about the Litigation do not prevent any member of the public from searching the court file, accessing the documents filed with the court, and learning the information on their own. As the court's orders simply hold the parties to the

confidentiality provisions of their settlement agreement and do not deny any member of the public access to court files, we find no error.

¶ 46    Next, defendants argue that the court erred by granting summary judgment for plaintiffs on the first affirmative defense which alleged that plaintiffs breached paragraph three of the settlement agreement by failing to deliver clear title to the Bonita Springs condominium, thereby rendering paragraphs 13 and 14 null and void under paragraph 15.

¶ 47    The Bonita Springs condominium is located within the Parklands West Community Development District (Parklands CDD) in Florida. CDDs are unique entities authorized under Florida law and are created to fund the construction and maintenance of the infrastructure (water, sewers, streets, etc.) for real estate developments. CDDs levy assessments against the properties within the development to recoup the cost of the construction and maintenance of the infrastructure improvements.

¶ 48    The CDD assessments have two components: (1) a capital assessment covering the original cost of constructing and installing the infrastructure; and (2) an operating and maintenance (O&M) assessment covering the continuing cost of operating and maintaining the infrastructure. The capital assessment is a specific amount based on the property's *pro rata* portion of the total construction cost for the development which is typically amortized over several years and thus paid in yearly installments. The capital assessment can be prepaid in full at any time.

¶ 49    The Parklands CDD levied both capital and O&M assessments against the Bonita Springs condominium each November 1 on an annual basis. The assessments were payable in 30 annual installments, although the owner could prepay the total amount at any time.

¶ 50    Deacon was represented by counsel for the transfer of the Bonita Springs condominium to her. Deacon's counsel agreed to pro-rate responsibility for payment of the Parklands CDD's capital

assessment. As a result, plaintiffs paid their pro-rated portion of the annual installment of the capital assessment through the date of closing in March 2011 and Deacon remained liable for future installment payments.

¶ 51   In December 2011, Apruzzese, on behalf of Deacon, notified plaintiffs' counsel of the Parklands CDD's annual capital assessments and asserted that they constituted unpermitted encumbrances on the Bonita Springs condominium in violation of paragraph three's requirement that plaintiffs transfer clear title to Deacon. Apruzzese demanded that plaintiffs cure the breach by prepaying the total amount of the 30 annual installments of the Parklands CDD capital assessments, but plaintiffs refused. Deacon subsequently prepaid the capital assessments in full, thus eliminating all future installment payments.

¶ 52   Defendants argue on appeal that plaintiffs' failure to prepay the entire 30 years' worth of capital assessments at the time of closing meant that there was a continuing encumbrance on the Bonita Springs condominium that violated paragraph three's requirement that plaintiffs eliminate all encumbrances and deliver clear title. Pursuant to paragraph 15, defendants argue that plaintiffs' violation of paragraph three voided paragraphs 13 and 14, meaning that defendants should be allowed to continue with their whistleblower complaints and publish their manuscript.

¶ 53   We disagree. Under Florida law, CDD assessments "constitute a lien on the property *** from the date of imposition thereof until paid." Fla. Stat. § 190.021(9). CDD assessments are "imposed" when they are "levied" against the property. *Trout Creek Properties, LLC v. Akerman, Senterfitt & Eidson, P.A.*, 294 F. Supp. 2d 1280, 1288-1289 (M.D. Fla. 2003). The notice of establishment of the Parkland CDD, as well as Parkland CDD's financial report, state that the capital assessments at issue here are levied on an annual basis, meaning that a new lien arises every year when the new capital assessments are levied. By paying off their pro-rated portion of the

-16-

capital assessments currently due at the time of closing, plaintiffs eliminated the lien/encumbrance for that year and transferred clear title to Deacon. We read nothing in the settlement agreement requiring plaintiffs to prepay the entire 30 years' worth of annual capital assessments before transferring title to Deacon.

¶ 54    Our holding is bolstered by: the testimony of Deacon's attorney at closing, who stated that plaintiffs complied with the clear title requirement by paying their pro-rated portion of the capital assessment due for that year; and the affidavit of a Florida attorney who similarly attested that plaintiffs satisfied their obligation under paragraph three of the settlement agreement to convey clear title by paying their pro-rated portion of the capital assessment due for that year. Also, Deacon's title agent issued a title commitment detailing the items necessary to clear title, and the payment of future capital assessments was *not* one such item. The title agent subsequently issued the title insurance policy, representing the agent's conclusion that plaintiffs had taken all of the necessary steps to transfer clear title.

¶ 55    *Duck Dog, L.C. v. Brownstar Properties, LLC*, 990 So.2d 525 (Fla. DCA 2nd Dist. 2008), cited by defendants, is inapposite, as it did not address the issue here: whether the passage of clear title requires the transferor of a property in a CDD to prepay all 30 years of a capital assessment, or whether he must pay only the portion of the capital assessment due in the year of the transfer. For all the reasons discussed in this order, we hold that plaintiffs here satisfied the clear title requirement when they paid the pro-rated portion of the capital assessment due in the year of the transfer.

¶ 56    Finally, defendants contend that the court failed to properly balance the equities when granting specific performance and injunctive relief for plaintiffs. In determining whether to grant injunctive relief or specific performance, the court should balance the equities (see *County of*

*Kendall v. Rosenwinkel*, 353 Ill. App. 3d 529, 541 (2004); *Schwinder*, 348 Ill. App. 3d at 477) by examining the impact the granting of equitable relief will have on the respective parties as well as on the general public. *Kalbfleisch ex rel. Kalbfleisch v. Columbia Community Unit School No. 4*, 396 Ill. App. 3d 1105, 1119 (2009). At a minimum, the court must tailor the equitable relief as narrowly as possible so as not to impose any greater restraint on defendants' activities than necessary and avoid unduly impacting public interests. *Elmer Miller, Inc. v. Landis*, 253 Ill. App. 3d 129, 135 (1993); *Fraternal Order of Police, Chicago Lodge No. 7 v. City of Chicago*, 2016 IL App (1st) 143884, ¶ 28.

¶ 57    Defendants allege that the equitable relief granted to plaintiffs unfairly requires defendants to forfeit their pending whistleblower award in claim numbers 2011-012502 (Apruzzese), and 2011-012501 (Deacon) and that such relief is harmful to the public welfare as it discourages private citizens from reporting wrongdoing to appropriate authorities. Defendants here made three whistleblower reports prior to entering into the settlement agreement, and the IRS's whistleblower award of over $40,000 was based on the allegations of wrongdoing contained in those reports. As defendants' whistleblower reports predated the settlement agreement and were a basis of the IRS' ultimate recovery of over $400,000 in additional taxes from the Estate, we find it inequitable for defendants to be required to forfeit the award premised on those reports. Accordingly, we remand for the circuit court to modify the order of specific performance and the injunctive order so as to allow defendants to keep the whistleblower award in claim numbers 2011-012502 and 2011-012501.

¶ 58    For all the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings.

¶ 59    Affirmed in part, reversed in part, and remanded.